JOHN J. LARSON, Appellee, v. JOHN E. SMITH et al., Appellants.

SPECIFIC PERFORMANCE: Contracts Enforceable—Options. An
1 option, on proper consideration, to a tenant to purchase the leased premises, embodied in the written lease of the premises, is valid in law and enforceable in equity, if proper election is made.

**VENDOR AND PURCHASER:** Bona Fide Purchaser—Knowledge of
2 **One In Possession.** A purchaser of real estate takes the same charged with notice of the equities of the person known by him to be in possession, and is not, therefore, a bona fide purchaser, especially when, before paying anything more than a nominal sum, he learned that the one in possession had a written option to buy.

**SPECIFIC PERFORMANCE:** Contracts Enforceable—Equitableness
3, 9 —Subsequent Increase in Value. A contract granting the right to exercise an option for the purchase of land during a stated period and at a stated price, fair and equitable when entered into, is not rendered inequitable, and therefore unenforceable, by the fact that, when the option is exercised, the land had greatly increased in value.

**SPECIFIC PERFORMANCE:** Fraud—Evidence. Evidence reviewed,
4 and *held* insufficient to show that an option for the purchase of land had been obtained by fraud.

**CONTRACTS:** Consideration—Mutual Promises—Performance. A
5 series of mutual promises constituting a complete written contract, especially when followed by performance in the order in which performance is due, manifestly furnishes complete consideration for every agreement of the contract. So *held* under a lease with usual covenants, plus an option in the tenant to buy.

**LANDLORD AND TENANT:** Leases—Options to Buy—When Ir-
6 revocable. An option to buy land, definite as to time and terms, contained in a lease, becomes irrevocable on acceptance of the terms of the lease, and assuredly after the tenant has gone into possession under the lease.

**CONTRACTS:** Consideration—Mutual Promises—Separation of Con-
7 sideration. The consideration arising from divers mutual promises, constituting a complete written contract, cannot be so separated that one of the promises is deprived of all consideration and all the consideration assigned to the remaining promises.

PRINCIPLE APPLIED: A lease, in addition to the usual covenants in regard to payment of rent, provided:
1. That it should run for five years from March 1, 1910.
2. That the rent should be two fifths of the grain and $2.50 an acre for pasture land.
3. That the landlord should furnish a portion of the seed.
4. That about $40 worth of tiling should be done each year, the tenant to haul the tile, board the men, and fill the ditches.
5. That the tenant might buy the land on named terms at any time prior to July 1, 1914.

6. That the tenant should keep the residence occupied.

7. That the landlord should furnish materials for repairs.

8. That the tenant should do the work on repairs.

9. That the landlord should pay for shelling his share of the corn.

10. That the tenant should pay all bills for threshing.

In June, 1914, the tenant elected to buy, and made due tender. Up to this point, both parties appear to have performed all agreements. *Held*, not competent for the owner of the land to show that, after all the terms of the lease had been fully agreed upon, the option to buy was ''just thrown in'' as a purely voluntary offer—one without any consideration whatever.

**EVIDENCE:** Parol, As Affecting Writing—Contradicting Written Option—Merger. Parol evidence, in the absence of fraud or mistake, is inadmissible to contradict the terms of a written contract. So *held* where attempt was made to show that the terms of a written option to buy land were not the terms which the parties had orally agreed upon.

**SPECIFIC PERFORMANCE:** Contracts Enforceable—Equitableness —Subsequent Increase in Value.

**ESTOPPEL:** Equitable Estoppel—Evidence—Sufficiency. An estoppel *in pais* arises only by some conduct which deceives or misleads. Evidence reviewed, and *held* insufficient to sustain a plea of estoppel to exercise an option to buy land.

**EQUITY:** Retention of Jurisdiction—Decree Beyond Issues. True, a court of equity, having once acquired jurisdiction, has large power to retain it and settle the entire controversy and end the litigation; *but it must not go beyond the issues tendered.*

PRINCIPLE APPLIED: Larson sought to exercise his written option to buy Smith's land. Smith refused to convey. Action for specific performance followed. Smith defended on several grounds, among which was that he had sold the land to Collins. Collins answered that he was a good-faith purchaser, without notice of Larson's right. Issue was thus joined. Collins, before so answering, had commenced an action at law against Smith for breach of contract to sell the land, and this was pending when the Larson action was tried. The court ordered Smith to convey the land to Larson. In addition, the court sought to adjust the equities between Smith and Collins (a) by ordering Smith to cancel the papers received from Collins, (b) by ordering Smith to return to Collins a $2,000 payment made by Collins, and (c) by giving Collins a lien on the amount going to Smith from Larson. Neither Smith nor Collins had prayed for an adjustment of their difficulty, nor had Larson pleaded any matter justi-

fying such adjustment. *Held,* the adjustment between Smith and Collins was beyond the jurisdiction of the court.

**SPECIFIC PERFORMANCE:** Decree—Nature of Deed to Clear Title
12  —Quitclaim or Warranty? In an action for the specific performance of a contract for the conveyance of land, in which plaintiff is successful, the court has no right to order a defendant who has unsuccessfully contended that he was a good-faith purchaser to convey to plaintiff his record interest *by warranty deed.* It should be by quitclaim.

*Appeal from Wright District Court.*—JOHN L. KAMRAR, Judge.

SATURDAY, MARCH 11, 1916.

ACTION for the specific performance of a contract between plaintiff and defendant Smith for the sale and conveyance of real estate. Defendant Collins was made a party because he claimed to have purchased the land from Smith without knowledge of plaintiff's contract. Defendant Smith denied the execution of the contract in the form it now appears; pleads that it was obtained from him through fraud and without consideration, and is void. Collins pleaded his purchase of the land from Smith without notice of plaintiff's claim. On these issues, the cause was tried to the court, resulting in a decree for plaintiff as prayed, and defendants, Smith and Collins, appeal.—*Modified* and *Remanded.*

*Nagle & Nagle, John E. Smith* and *Kenyon, Kelleher & Price,* for appellants.

*Birdsall & Birdsall,* for appellee.

DEEMER, J.—I. Plaintiff, Larson, is a farmer living in Wright County, Iowa, and defendant Smith was, at all times material to our inquiry, a resident of Somonauk, Illinois, and defendant Collins is a resident of Webster County, Iowa. In September of the year 1909, Smith came to Iowa to find a tenant for the land in controversy, consisting of 120 acres in Wright County, and induced plaintiff to enter into a contract of lease. That agreement was reduced to writing, and signed

by the parties on or about September 8th, and was for the term of five years from and after March 1, 1910, and the rental agreed upon was two fifths of the corn and grain raised upon the land, and $2.50 in cash annually for all the hay and pasture land. Smith was to furnish some of the seed for the land and also to do from $30 to $40 worth of tiling each year, Larson to haul the tile, board the men and fill the ditches. The lease contained the usual covenants and stipulations regarding the payment of rent, etc., and concluded as follows:

Smith "hereby agrees with said Larson that he may purchase the above described land at any time before July 1, 1914, on the following terms: The purchase price to be $75 per acre, of which $1,500 is to be a cash payment, and for the balance of the purchase price, Smith will accept a note drawing four per cent. interest per annum, payable annually, same to be secured by a mortgage on the above described land, said mortgage to be a first lien. Said note to run for not to exceed seven years. Said Larson agrees to see that the house on the above described land is occupied by a good, desirable tenant at least 10 months of each year this lease is to run, and for the full term if possible. Said Smith agrees to furnish posts, wires and staples for repair of fences and material for other ordinary repairs, and Larson agrees to do such work free of charge. Smith agrees to pay the bill for shelling his share of corn, but Larson is to pay all threshing bills."

This lease was duly acknowledged by the parties, but was not recorded until June 26, 1914. On March 1, 1910, plaintiff went into the possession of the property under this lease, and was in possession thereof at the time this action was commenced. Down to the time of the commencement of the suit, plaintiff had performed all the conditions of the lease on his part, and defendant Smith was satisfied therewith. On June 3, 1914, Larson went with his attorney to Illinois to see Smith, for the purpose of enforcing his option to buy, and there made the necessary tender to Smith and demanded a deed in accord with the stipulations in the lease. Smith refused to perform,

claiming that he had fixed the price for the land at too low a figure, and that he had already disposed of it to his codefendant, Collins, for $100 an acre. Within a few days, plaintiff served Smith with a written notice of his election, and tendered him the money, note and mortgage called for by the contract. Smith refused to receive it, and the tender has been kept good by a deposit with the clerk of the courts. Defendant Collins, who is a real estate agent, in some manner heard that the land could be purchased, and in the fall of the year 1913, he went to Illinois to see the owner, Smith, and on September 15, 1913, he entered into a written contract for the purchase of the land, paying $50 down when the contract was signed. This agreement reads as follows:

"Somonauk, Ill., Sept. 15, 1913.

"I hereby agree to sell my farm of 120 acres to M. J. Collins of Clare, Iowa, for $100 per acre, subject to terms as follows: $50 cash, $2,000 Mch. 1-14, the balance of purchase money to run 10 years with interest at 5%. Interest payable annually. Optional payments, any or all at any time, or not any for full term of 10 years. Said lands situated as follows: E ½ of SW ¼ & SE ¼ of NW ¼, Sec. 2, Twp. 92, Range 25 West 5 P. M., Wright Co., Iowa.

"John E. Smith.
"M. J. Collins."

Collins knew that a tenant was in possession of the premises which he purchased, and was afterwards, and before the payment of any part of the purchase price except the $50, shown a copy of the plaintiff's lease which contained the option to purchase. In the latter part of March of the year 1914, Collins made a deposit with a bank in Somonauk, Illinois, of $2,000 to be paid to Smith on delivery of deed and abstract covering the land in controversy, and also, as we understand it, offered to make a note, or notes, and mortgages to comply with the terms of his agreement with Smith, and Smith made a

deed to the lands running to Collins, which excepted from the covenants "a lease of the premises held by tenant now in possession." Smith claimed that this was in accord with the original agreement, but Collins, through his attorneys, objected to this clause; yet they finally agreed to accept it. The papers had not changed hands at the time this action was commenced, and Collins had actual notice of the option written in plaintiff's lease in November of the year 1913, before he had paid any of the purchase price except the $50 in cash. There is some dispute in the testimony regarding the value of the land at the time the option was granted, but the decided weight of the testimony is that it was not worth more than $75 an acre. It was wet and covered with ponds at that time, and has since been partially drained, having been included in a drainage district and taxed for its part of the expense thereof. It rose rapidly in value after the year 1910, and in 1913, is said to have been worth from $100 to $115 an acre, and in 1914, from $120 to $125. These are outside figures, but they demonstrate that, on account of the improved condition of the lands themselves and the extraordinary rise in value common to all Iowa lands, there was an increase in value of approximately $45 to $50 an acre during the period called for by plaintiff's option. Collins did not pay the outside price when he purchased; and during the year thereafter, the land increased from $10 to $15 an acre in value. Smith is the man whose judgment seems to have been bad, if he made the deals which are here in controversy. In this state of the record, it seems clear that, as between plaintiff and the defendants, plaintiff is

1. SPECIFIC PERFORMANCE: contracts enforceable: options.

entitled to the relief demanded by him. On the face of it, the option was good; and when plaintiff elected to enforce it, assuming that he did all that was required of him in the matter of making tender, he was entitled to a specific performance of the agreement. Such an option is valid in law and enforceable in equity, if proper election is made. *King v.*

*Raab*, 123 Iowa 632; *Crawford v. Paine*, 19 Iowa 172, 176; *Goodpaster v. Porter*, 11 Iowa 161, 162; *Butler v. Threlkeld*, 117 Iowa 116. When Collins purchased, he was told that Larson was in possession of the land, as he in fact was; and before paying anything more than the $50 to bind the bargain, he was shown a copy of the lease which contained the option under which plaintiff is now claiming. At best, he was only a purchaser to the extent of the $50 paid; and as he has not parted with his $2,000, and the mortgage to secure the balance has not been delivered, or the deed to Collins delivered, the commencement of this action was notice to him; so that he is not a good-faith purchaser and entitled to protection as such. *Phillips v. Blair*, 38 Iowa 649; *Murphy v. Anderson*, (Minn.) 150 N. W. 387.

2. VENDOR AND PURCHASER: bona fide purchaser: knowledge of one in possession.

We may also, in this connection, dispose of the claim that the option contract was so inequitable that it should not be enforced in equity. This matter is to be determined not as of the date when it was finally exercised, but upon the situation as it existed when the contract was entered into. The future could not then be foretold. It was reasonable to suppose that lands would continue to advance, but no one could know that to a certainty.

3. SPECIFIC PERFORMANCE: contracts enforceable: equitableness: subsequent increase in value.

Of course, the plaintiff took no chances under the contract, but that was one of the reasons why he did not enter into a binding contract to purchase. Smith may have made a mistake in judgment in granting so long an option, and in the character of the contract he was willing to make regarding the payment of the consideration; but if not induced by fraud or without consideration, these circumstances are not sufficient to justify a court in refusing specific performance. The optionee is entitled to the rise in value of the lands. *King v. Raab, supra; Peterson v. Chase*, (Wis.) 91 N. W. 687; *Anderson v. Anderson*, (Ill.) 24 A. & E. Ann. Cases 556, and cases cited.

II.   By this process of elimination, we are brought down to the real issues in the case:   (1) Was the option contract secured by the fraud of Larson?   (2) Was it without consideration?

Upon the first proposition, defendant Smith, while admitting that he had some talk with Larson about an option and really agreed to give him one for a limited time, and while admitting that he signed the lease in which the option appears, testified that, when it was read over to him before he signed, this clause was omitted, and that he signed the same without knowing that it contained an option clause.   The lease was executed in duplicate and both copies are before us.   A mere inspection thereof shows that the option clause must have been in it at the time it was signed, and that it has not been added since its execution.   True, defendant says he did not receive a copy of the lease at the time of signing, and that the copy in evidence is the one sent to Collins, and we may accept that explanation as true; but it is, nevertheless, the fact that the option clause must have been in the lease at the time he signed it, although he says that, in his negotiations with Larson before the lease was signed, he agreed to give him an option for two years, or until March 1, 1911. Strange it is that, if nothing was read to him from the lease regarding an option, he did not speak of it before signing.   To escape the consequences of his neglect in signing the lease, he says that he is nearsighted; that it was dark when he was called upon to sign; and that he relied upon the scrivener, a banker, who drew it, to read it to him; and that this banker did not read this or any option clause or other clause of like character.   He admits, however, that both he and Larson told the banker the terms of the lease, and says that he did tell Larson that he could have a two-year option to purchase the land for the price of $75 an acre, and upon substantially the terms stated in the contract, and that he shook hands with Larson on the proposition.   The banker was called as a wit-

4. SPECIFIC PER-
   FORMANCE:
   fraud:
   evidence.

ness and testified positively that he read to Smith the type-written part of the lease, the option clause being one of the many parts thereof, and all. agree that the banker knew noth[L] ing of the terms of the lease until he was called upon to draw it, and that these terms were stated to him by either Larson or Smith in the presence of the three, at the time the banker wrote the same on the typewriter; so that we must find that this option clause was in the lease at the time it was signed, and that no fraud or deceit was practiced upon Smith at the time of signing, or at any other. Smith says, also, that he signed but one copy; whereas it is apparent that, no matter who took the copy, there were two copies made at the same time, and that Smith signed both. Again, when he was called upon to perform the option after he knew of the option clause, he did not plant his refusal to perform on the ground that there was no contract, but simply on the ground that he had agreed to sell the land too cheap, and that he had sold it to another at $100 an acre. Moreover, Smith was out to see the land in the year 1912, and, according to Larson's testimony, was told at that time of the option contract, and he (Smith) said he remembered it. This was at a time when there was some discussion regarding the tiling of the land, and was not an unnatural circumstance. Indeed, Smith does not deny it in his testimony. The only thing in the whole record throwing any discredit on plaintiff's claim is a letter written in his name to defendant Smith, under date of May 20, 1914, as follows:

"As this is the last year I got your land, I would like to know if you would rent it to me again, or if you hold it for sale. I will buy it if your terms are reasonable. Will you please inform me right away, or as soon as possible? I would like to make a deal with you, one way or the other."

This letter, by whomsoever sent, was received by Smith and he replied as follows:

"In reply to your letter, will say I have sold the farm

to Mr. Collins, of Fort Dodge. You can probably rent or buy from him. How about the rent for last year? I have not received anything so far. If Mr. Weber has the money, please see him and tell him to send it to me at once. Also send me tax receipt.''

The body of this letter, of date May 20th, was evidently not written by Larson, and he says it was done without his knowledge or consent by his sixteen-year-old son, and that he knew nothing of it until the answer came. He admits that it was sent in an envelope addressed to Smith at his proper post office, and that he wrote the name and address on the envelope, which he says he obtained of the banker for the purpose of writing to ascertain whether or not the rumor that he (Smith) had sold the land was true; and that his son must have used this envelope when he wrote the unauthorized letter. This circumstance is, of course, peculiar; but it is also to be said in support of Larson that if he had time to write the address and direct the terms of the letter, he must also have had time to write the letter himself, rather than to dictate it to his son. It was signed in the name of Larson, so that there was no attempt to dissemble here. Larson knew at that time that Smith either had sold or was attempting to sell the land; and immediately upon getting the letter from Smith in answer to the one from the son, he made preparations to carry out his option, which would not expire until July of that year. It is doubtless true that the boy, without knowing the full terms of the lease, but having knowledge as to when it would expire, became officious in the matter and wrote the letter of his own accord, thinking to benefit his father in some way; for he (the boy) was anxious to have the lease renewed, or to have his father purchase the land. But whatever the truth about this, it is not sufficient, under this record, to overcome the testimony offered by the documents and by the testimony of a wholly disinterested witness. Some claim is made that the banker became interested in making a profit from the sale. There is

no testimony to sustain this contention, although the banker did let Larson have the money to make a tender to Smith, without taking any security. There is not sufficient testimony to justify a conclusion of fraud, sharp practice or deceit.

III. As to the consideration. The lease was in writing and, of course, a consideration is implied. In addition, Larson took an absolute lease of the land for the term of five years, and agreed to pay the rentals heretofore stated and to perform the other covenants of the lease to be performed for the entire term. He entered into possession and complied with all of the terms of the lease down to the time he exercised his option to purchase. Surely, these things are a sufficient consideration for Smith's agreements, among which was the option to purchase. After acceptance of the terms of the lease, and surely after entering into possession of the land, if not before, the option to purchase became irrevocable. *King v. Raab, supra; In re Hunter,* 1 Edw. Ch. 1; *Souffrain v. McDonald,* 27 Ind. 269; *Johnston v. Wadsworth,* (Ore.) 34 Pac. 13; *Hall v. Center,* 40 Cal. 63; *Myers v. Stone,* 128 Iowa 10; *Gustin v. Union School Dist.,* (Mich.) 54 N. W. 156; *Clason v. Bailey,* 14 Johns. (N. Y.) 484; *Breen v. Mayne,* 141 Iowa 399; *Horgan v. Russell,* (N. D.) 43 L. R. A. (N. S.) 1150.

**5. CONTRACTS: consideration: mutual promises: performance.**

**6. LANDLORD AND TENANT: leases: options to buy: when irrevocable.**

But it is contended for appellant Smith that this option, even if granted, was a mere gratuity, made or offered to Larson after all the other terms of the lease had been agreed upon, and that, had it been inserted in the lease with his knowledge and consent, he is not bound thereby, because it was unsupported by any consideration whatever. In disposing of this contention, we must assume that the lease was in its present form when read over to Smith, and that he signed it with full knowledge of its contents. Counsel for

**7. CONTRACTS: consideration: mutual promises: separation of consideration.**

appellants cite us to *Davis v. Petty,* 48 S. W. 944, an opinion
by the Supreme Court of Missouri, in support of this conten-
tion of no consideration. It is true that, under the peculiar
facts of that case, the court held that there was no considera-
tion for the option; but the main stress is put upon laches of
the optionee and his abandonment of the option, in addition
to equities arising in the optionor, due to very large improve-
ments upon the property optioned. Here there was no aban-
donment of the option,—no laches,—for the term for which
it was granted had not expired; whereas, in the cited case,
no term was fixed for the exercise of the option, and the
conduct of the optionee was such as to indicate that he had
wholly abandoned his purpose to take the property under the
option, and did not conclude to take it until five or six years
after the option had terminated as to time, and then sought
to take advantage of it because of a wholly unexpected and
sudden increase in the value of the property optioned. Of
course, a voluntary option not based upon a consideration
cannot be specifically enforced. *Litz v. Goosling,* (Ky.) 19
S. W. 527, 528 (21 L. R. A. 127), and many cases cited. But
the difficulty lies in determining whether or not the partic-
ular option sought to be enforced is without consideration.
Here it was one of the conditions of the lease and formed an
indivisible part thereof. It was agreed to when the terms of
the lease were stated to the scrivener, and inserted before
signing. Is it permissible now to show that the matter was
not talked about until the scrivener was
called upon to act, or, if considered, it was a
mere voluntary offer of the lessor, after the
other terms were agreed upon, or that it was
not the kind of option agreed upon in their
oral negotiations leading up to the lease? Is this sort of testi-
mony admissible in the absence of a plea of fraud or mistake
in the writing of the lease? We think it clear that, if we are to
observe well settled rules of law, such testimony is not admis-

8. EVIDENCE:
parol, as af-
fecting writ-
ing: contra-
dicting writ-
ten option:
merger.

sible on the simple plea of no consideration for that part of the lease granting the option. When a written contract is executed between parties, the universal rule is that all prior negotiations are merged therein and, in the absence of fraud or mistake, this written contract becomes the absolute, sole and only proof of the agreements between them. To permit one to defeat any of the stipulations therein by showing that they were voluntarily inserted and were not regarded by him as an essential part of the contract would effectually undermine and destroy the parol evidence rule. See 2 Elliott on Contracts, Secs. 1620, 1621; *Gelpcke v. Blake,* 19 Iowa 263. The consideration for the instrument and for the mutual promises therein contained are clearly stated and not subject to change by parol testimony. 2 Elliott on Contracts, Sec. 1642, and cases cited. Even were there an exception to this rule, as indicated by the Missouri Supreme Court, it would not apply here; for it is admitted that Smith, in the negotiations between him and Larson before the execution of the lease, brought up the matter of selling the land and that he told him (Larson):

"That I was willing to sell at $75 an acre, $1,500 cash, the balance six or seven years, 5%. He was only to have that option for two years. We merely shook hands on it. . . . I gave Larson two years in which to buy the land. That would be two years from the 1st of March, 1909; that would be March 1, 1911. The lease was made in the fall of 1909. I told him, 'I will give you one year, or I will give you two years, until March 1, 1911.' "

Larson testified:

"I would not have bought the land at that time for $75. I did consider that the option on the land was of some value at that time. I considered that the price was $15 an acre higher than the land was worth. Land had been going up all the time, and I knew it would go up. I believe I counted on its going up, so that the option would become valuable."

When the terms of the lease were given to the banker,

Weber, this option was stated as a part thereof, and it was embodied in the lease before it was signed. Manifestly, there was a consideration for it, and, under well settled rules, it cannot be eliminated from the lease as an entirely distinct and divisible part of the contract and held to be purely voluntary and without consideration.

9. SPECIFIC PER-
FORMANCE:
contracts en-
forceable:
equitableness:
subsequent
increase in
value.

It is argued, however, that the contract was an improvident one and that it should not be specifically enforced. As already observed, the only evidence of improvidence, except in the terms of the option, is that the land rapidly increased in value—a matter which could not have been foretold—and that the term of the option was too long. The exact claim is that it was a bad bargain. This fact alone is not sufficient to justify a court of equity in refusing specific performance. Pomeroy on Equitable Remedies, Sec. 789; *Franklin Tel. Co. v. Harrison*, 145 U. S. 459; *Young v. Wright*, 4 Wis. 163; *Lee v. Kirby*, 104 Mass. 420; *Ready v. Noakes*, 29 N. J. Eq. 497; *Sweeney v. O'Hora*, 43 Iowa 34, 39. The reason for this is that courts do not undertake to make or revise contracts entered into by parties competent to contract; and as a rule, one is entitled to the benefits of his bargain. However, if there be any proof of unfairness or deceit or of the taking of an undue advantage of one who, by reason of his infirmities of mind, is led into a bad bargain, a court of equity will refuse to enforce it, and remand the parties to an action at law. *Ross v. Ross*, 148 Iowa 729; *Lucas v. Barrett*, 1 G. Gr. 510; *Moetzel v. Koch*, 122 Iowa 196; *Schneider v. Schneider*, 125 Iowa 1; *New York Brokerage Co. v. Wharton*, 143 Iowa 61. We find no evidence of any unfairness or of anything on the part of Larson indicating an intent to deceive Smith or to take advantage of any infirmities he may have labored under, and there is no claim that Smith was not perfectly competent to transact his business.

IV. While estoppel and laches are pleaded, we see no

evidence of either. Larson exercised his option apparently in good faith, within the time given him by the lease, and he did nothing to deceive or mislead Smith. In the year 1912, he called Smith's attention to the contract, and he (Smith) did not deny it, but in fact admitted that he remembered it.

**10. ESTOPPEL: equitable estoppel: evidence: sufficiency.**

They were then talking about the value of the land, and Larson did nothing to indicate that he did not intend to exercise his option within the time limit; at least said nothing before Smith sold to Collins which should be treated as an estoppel. Even had the letter Larson's boy wrote to Smith been with authority, this was after Collins had purchased the land. The essential elements of an estoppel are wanting.

V. The decree protected Smith, in that it required plaintiff to pay him $500 for permanent improvements made since the execution of the lease, and also required Larson to take the land subject to the drainage tax assessment, and further required him to pay the taxes on the land for the year 1914. This $500 was ample to take care of all expenditures made

**11. EQUITY: retention of jurisdiction: decree beyond issues.**

by Smith upon the land after the making of the lease. The decree also provided:

"The court further finds that in adjusting the equities between all parties hereto that the defendant, John E. Smith, should return and repay to M. J. Collins the $2,000 paid by him upon his contract of purchase and return to him the note and mortgage made in pursuance thereof, and that said mortgage should be cancelled of record, and discharged and released as a lien upon said land. . . . And it is ordered and adjudged that if said plaintiff, within fifteen days from the date of this decree, deposit the said sum of $500 with the clerk of this court, as above provided, then the defendants, John E. Smith and M. J. Collins, shall, within thirty days from the date hereof, execute and deliver to the said plaintiff, John J. Larson, or deposit with the clerk of this court for his use, a good and sufficient deed or deeds, conveying the

said real estate to the said John J. Larson, free from encumbrance, except the taxes for 1914, and the drainage assessments existing against said land, and in the event that they, or either of them, fail to do so, then B. A. Banks is hereby appointed a commissioner to make said deeds in their name or names and he is hereby authorized and empowered so to do. It is further ordered, adjudged and decreed that the said John E. Smith cancel, release and discharge of record the mortgage made to him by M. J. Collins, and now appearing of record in Wright County, within thirty days from the entry of this decree, provided the plaintiff shall deposit the additional $500 hereinbefore provided for, and if he fail to cancel and discharge said mortgage, then the clerk of this court is hereby appointed, empowered and directed to do so by proper entry upon the margin of the record of said mortgage. It is further ordered that the defendant, M. J. Collins, be, and he is hereby, given a lien upon all the money deposited with the clerk of this court, and upon the note and mortgage of $7,500 deposited by plaintiff with said clerk, to secure to him the return of the $2,000 paid by him to the said John E. Smith, and the return to him of his said note and mortgage executed by him to the said Smith.''

Defendant Collins, who took a separate appeal, complains of this decree so far as it affects him. Under the issues presented by plaintiff, we think the trial court was entirely justified in entering a decree cancelling the mortgage made by Collins to Smith, and that it was also justified in requiring Collins to make a deed of the land to plaintiff; but this deed should not be a warranty one, for to that, plaintiff was not entitled. At best, he was entitled to a quitclaim deed from Collins, although a decree quieting plaintiff's title as against Collins would have been quite as effective. As to that part of the decree settling the equities between Collins and Smith, serious complaint is made; for it is said not to be within the issues tendered or

12. SPECIFIC PERFORMANCE: decree: nature of deed to clear title: quitclaim or warranty.

covered by the prayer of the petition or any other pleadings filed in the case. It also appears that, before Collins answered in this case, he had commenced an independent action at law against Smith for breach of his contract, which was pending when this case was determined; and he is entitled to have that case tried, and not prejudged in this action. There was no issue tendered as between Smith and Collins, and no prayer in the pleadings filed by either for an adjustment of their matters; nor did the plaintiff present any issue which gave either of these parties any license to claim that the equities between them should be adjusted upon this hearing. Doubtless this was for the reason that there was a suit pending between them at the time they filed their pleadings in this case, in which issues were tendered as to their respective rights. They might doubtless have waived this and submitted issues which would have justified the trial court in settling their rights and equities; but as they did not do so, the court acted in excess of its jurisdiction, and that part of the decree cannot be sustained. There was nothing for the court to do in this case but to settle the right and equities as between plaintiff and the defendants, Smith and Collins, without indicating any views as to the rights and equities between Collins and Smith, in the event it found for plaintiff. In these respects, the decree should be modified, and the cause must be remanded for that purpose.—*Modified* and *Remanded.*

EVANS, C. J., WEAVER and PRESTON, JJ., concur.