L. C. PETERSEN, appellee, v. MARJORIE J. OLSON et al., appellants.

No. 50483.

JANUARY 9, 1962.

Fitzgerald, Hamer, Brown & Leahy, of Omaha, Nebraska, and Jones, Cambridge & Carl, of Atlantic, for appellants.

Clark D. Mantz, of Audubon, for appellee.

PETERSON, J.—This is a specific performance action. It pertains to a contract entered into July 15, 1941, between plaintiff and Mabel Bennett, now deceased. The contract involved an option of purchase as to a farm of 70.82 acres in Cass County, the management of same, and division of net income. Defendant Marjorie J. Olson is the daughter of Bess Pedersen, also deceased, who was the heir and grantee under deeds from Mabel Bennett's other heirs. Upon Mrs. Pedersen's death Mrs. Olson became the owner of the fee title to the land, subject to the agreement between plaintiff and Mabel Bennett. The trial court decreed specific performance as to the farm, and an accounting as to rents collected by both parties. Defendants have appealed.

We will state the facts in chronological order. On October 11, 1940, G. M. Chaffee, referee, entered into a written contract of sale with L. C. Petersen, plaintiff herein, as to sale of the farm in Cass County. On November 15, 1940, Mr. Chaffee executed a referee's deed conveying the farm to Petersen. On December 20, 1940, Petersen executed a deed to the property to Mabel Bennett. Shortly thereafter Petersen and Miss Bennett entered into the following agreement:

"AGREEMENT:

This agreement made this 15th day of July, 1941, by and between Mabel Bennett of Des Moines, Iowa, first party, and L. C. Petersen of Kimballton, Iowa, second party: WITNESS-ETH:—

That the first party is the owner of the following described real estate located in Cass County, State of Iowa, viz.: [detailed lengthy description]

That same was purchased about October *18th* 1940, by the mutual efforts of both parties and title thereto is vested in said first party, therefore, in order to place in writing the agreement of the said parties with reference thereto,

IT IS FURTHER AGREED as follows:—

That second party may purchase said real estate at any time within twenty years from the date hereof by paying the first party the sum of $2000.00 with interest thereon at three per cent per annum from the date of said purchase, less the interest paid first party from the income of said land as hereinafter mentioned; that said second party shall and is hereby given the exclusive, nonrevocable right and authority to look after and manage said real estate, pay the expense of operating same including all necessary expenses thereof from the income therefrom, and including reasonable compensation for his time in so doing and his expenses in performing said service, the expenses of operation shall also include a charge of three per cent on said investment of $2000.00 of first party, in addition to taxes, insurance, repairs, etc. as may, in the discretion of second party, be necessary, and said second party shall also rent said land and collect the rents and profits therefrom as a part of his duties, in fact he is to have sole charge thereof to the same extent as if he were the owner thereof. After the payment of said expenses and charges above mentioned and contemplated thereby the net profits from the rents of said land shall be divided share and share alike between the parties. Settlement shall be made annually on February 1st of each year.

In the event second party exercises his option to purchase said land the first party agrees to take back a mortgage for $1000.00 for a period of five years from the date the option is exercised with four per cent interest per annum.

Second party agrees to perform the agreements hereby stipulated for him to perform.

Dated at Audubon, Iowa, this 15th day of July, 1941.

> Mabel Bennett
> First Party
> L. C. Petersen
> Second Party."
> Duly acknowledged.

In accordance with the provisions of the agreement Mr. Petersen managed the farm through the years from 1941 to 1951. Usually the parties would meet once a year and compute the amount of the expenses, and then divide the net income fifty-fifty between them. Plaintiff was in the electrical business in Kimballton. Defendant was a nurse working largely in and around Des Moines. They had been acquainted and were good friends for many years.

In the winter of 1949 Miss Bennett made a trip to Florida. Prior to the trip plaintiff had mailed her a check for $766.33, which check was marked in "Full to date". On August 21, 1950, Mabel Bennett wrote a letter to plaintiff in which she said as follows: "I sure thank you for your good work in taking charge of the farm. * * * As near as I can tell I now have you paid up and through 1948—for the care of the farm." It seems that in addition to 50% of the net return she paid plaintiff $50 a year for his care of the farm.

The farm was extremely run down when plaintiff and Miss Bennett took it over. He did a large amount of work personally on the farm. He testified: "I picked up a lot of rocks and cleaned up a lot of brush, built fences, put up a crib, and whatever there was—killed cockleburrs. I did the work personally. I helped some with the seeding. We hauled a lot of fertilizer from here. * * * I had three tractor spreaders going out there, the man and I had trucks coming from here [from Atlantic]."

The relationship between plaintiff and Miss Bennett was at all times friendly, and in fact cordial. There was never any difficulty between them as long as she lived.

On January 7, 1951, Miss Bennett died at Omaha, Nebraska.

The defendant LeRoy V. Olson, husband of Marjorie J. Olson, a niece of Miss Bennett, was appointed administrator of her estate in Douglas County, Nebraska, and in Cass County,

Iowa. Immediately after Miss Bennett's death, Mr. Olson had a conversation with Mr. Petersen in which Mr. Petersen told him that he had a "buy-sell" contract with Miss Bennett. In September of 1951, Mr. Olson came out to the farm and went with Mr. Petersen to examine everything on the farm. At that time the following conversation, in part, took place between them: We quote from Mr. Olson's testimony: "Mr. Petersen asked me who I thought owned the land? I replied that the record owner was Bess M. Pedersen. At that Mr. Petersen said 'I have a piece of paper which will show differently.'" These conversations are not sufficient to establish any interest of Mr. Petersen in the land, but they were sufficient to alert the family to the fact that he was making a claim to the farm.

On January 3, 1952, plaintiff filed a document in the office of the recorder of Cass County, Iowa, which did give defendants, and all other parties, constructive notice as to his interest in the farm. The statement is as follows:

"STATEMENT IN WRITING RELATING TO CLAIM TO REAL ESTATE DESCRIBED

I, Louie C. Petersen, pursuant to the provisions of Section 614.17, Iowa Code Annotated making the following statement of my claim relative to the following real estate, situated in Cass County, Iowa to-wit: [detailed lengthy description]

I purchased this real estate from the estate of W. A. Payne (Chaffee referee) by contract under date of October 18th, 1940; title was later taken by me under said contract by deed, but due to the fact that I was without funds to settle for the land under the contract and the required money was furnished by Mabel Bennett to me in the amount of $2000.00 the land was later deeded by me to Mabel Bennett for security and as an equitable mortgage and to be reconveyed by Mabel Bennett to me at any time I paid the sum secured which arrangement yet persists; that during the time the real estate was held under deed by Mabel Bennett the income was to be and was divided by Mabel Bennett and me to apply upon interest for Bennett and upkeep and carrying charges for me; the title to said real estate is in that state at the present time. I own the legal title subject to the above described equitable mortgage and in said amount.

Louie C. Petersen"

Duly acknowledged.

This is important because of the maneuvers by and on behalf of defendants which occurred shortly thereafter.

At that time Mallonee & Mallonee were attorneys for plaintiff. Mr. Clark Mantz later became the attorney and tried the case in the District Court and in this court. Mr. Mallonee wrote defendant Mr. Olson on January 7, 1952, as follows:

"January 7, 1952

Mr. LeRoy Olson
Administrator of the Estate of Mabel Bennett
912 First National Bank Building
Omaha, Nebraska

Dear Sir:

Your letter of the 2nd inst. directed to Mr. Louis Petersen, Kimballton, Iowa, has been turned to me for reply.

Mr. Petersen does not concede your claims with respect to the land referred to in your above described letter. He does not concede your right to sell the corn in question.

He claims the equitable title to the real estate subject to an equitable mortgage on the part of Mabel Bennett and her heirs. The mortgage amounts to approximately $2000.00. He hereby tenders you full payment thereof and demands deed therefore.

You may write direct to Mr. Petersen or to the undersigned.

Very truly yours,

Mallonee & Mallonee

L. Dee Mallonee"

LDM/bk

Miss Bennett left her three sisters as her only heirs. They were Anna B. Mann, a widow, Margaret B. Platner, married, and Bess M. Pedersen, a widow. In the latter part of July 1952 Mrs. Mann and Mrs. Platner and her husband deeded their interest in the farm to Bess M. Pedersen.

On July 17, 1952, Bess M. Pedersen deeded the farm to herself and her daughter Marjorie J. Olson, defendant herein, in joint tenancy. Shortly thereafter Bess M. Pedersen died leaving defendant Marjorie J. Olson as the fee owner of the farm, subject to the rights of plaintiff.

On November 20, 1953, plaintiff's first attorneys, Mallonee & Mallonee, filed a quieting-title suit against Mr. and Mrs. Olson, and all other parties interested, praying for the quieting of his title subject to the interest of Mabel Bennett and her successors in interest. This suit was pending for almost four years with motions, answer, reply, and a final motion, filed from time to time. Defendants' final motion was to dismiss the action as not being in proper form. On October 10, 1957, the District Court sustained the motion, stating in the order as follows:

"The Court finds that the plaintiff's Petition seeks to quiet title to the real estate described therein and further that the Petition admits upon the face thereof that the legal title to said real estate is in one Mabel Bennett and the plaintiff further admits the execution of a contract, attached to the said Petition and marked Exhibit A, in which contract it was agreed between the parties that the plaintiff should have the option to purchase said land in accordance with said agreement."

On October 31, 1957, shortly after the dismissal of said action, plaintiff caused to be mailed to Marjorie J. Olson the following tender and demand for deed:

"NOTICE OF EXERCISE OF
OPTION TO PURCHASE

TO: Marjorie J. Olson, 5427 Lafeyette,
Omaha, Nebraska
Title Holder:

You are hereby notified that the undersigned optionee, L. C. Petersen of Kimballton, Iowa, has deposited with the Clerk of the District Court of Cass County, Iowa, the sum of Two Thousand Four Hundred Eighty Dollars ($2480.00) in cash, this 31st day of October, A.D., 1957, for the purpose of exercising his right of option to purchase the real estate described as follows, to-wit: [detailed lengthy description]

That said option to purchase the above and foregoing real estate is in accordance with an agreement executed by Mabel Bennett, your predecessor in title bearing date of July 15, 1941, acknowledged on the said 15th day of July, 1941, before S. C. Kerberg, Notary Public in and for Audubon County, Iowa, and filed for record in the office of the Cass County Recorder in Book 360 at page 293 on the 25th day of August, 1952.

That a copy of said Agreement is hereto attached, marked Exhibit 'A' and by this reference made a part hereof.

You are further notified that the said sum of $2480.00 is available to you upon delivery of the title to the said above described real property to the undersigned optionee herein.

You are further notified that unless you transfer title to the undersigned hereto, within ten (10) days from the date of the Service of this Notice upon you, proper legal proceedings will be instituted for the specific performance of said option to purchase.

To all of which take Notice and govern yourself accordingly.

/s/ L. C. Petersen

Optionee"

On the same day plaintiff deposited in the office of the clerk of the District Court of Cass County the sum of $2480, being the $2000 referred to in the agreement between Mr. Petersen and Miss Bennett and eight years interest at 3% according to the agreement. Up until 1949 the interest had been paid in full each year, so the interest computed on this tender and deposit was from 1949 until 1957.

In October 1958 this action for specific performance was filed.

I. Appellants' first assignment of error is that plaintiff abandoned his claim as to the farm under the provisions of the agreement.

Appellants' counsel bases his claim of abandonment on the fact that plaintiff had previously maintained a quieting-title proceeding. He cites many cases in support of his alleged contention and quotes from several of them. The cases are not applicable in support of the instant case. The facts in the case at bar are completely different from the facts in the cases cited.

The distinctive difference is that in the cases cited the quieting-title suit, or other cases commenced prior to the specific performance suit, were on the basis of theories inconsistent with the specific performance suit. In the case at bar the quieting-title action was commenced on the basis of the agreement quoted above and the specific performance suit was commenced on the

basis of the same agreement. In fact, some of appellants' quotations sustain this distinction.

In 81 C. J. S., Specific Performance, section 22b, the text states: "Specific performance may be denied a person *where he has elected to pursue a remedy inconsistent with the existence and continuance of the contract sought to be enforced* \* \* \*." (Emphasis ours.)

In the case of Whittenburg v. Groves, Tex., 208 S.W. 901, 904, the court said: "What we do hold is that Whittenburg's attitude was such as conclusively shows a *repudiation of the contract by him,* and that for this reason he should not be permitted to have it specifically enforced." (Emphasis ours.)

Conduct upon the part of the parties seeking to specifically enforce an agreement which is inconsistent with the agreement and the rights established under the agreement has been recognized by the courts as evidence of an intention upon the part of such party to abandon the agreement.

Again, appellants quote from Farrow v. Farrow, Mo., 277 S.W.2d 537: "Plaintiff, by his partition suit and his contention that the contract was void, repudiated the contract. The rule is that such action justifies a court in refusing in a later action by the same party to enforce the contract." Many cases cited.

The distinction is clear. Plaintiff did not in any manner repudiate his agreement in the quieting-title suit. His attorneys selected the wrong form of action and this cannot be designated as an abandonment of his cause of action on the contract.

In the case of Zimmerman v. Robinson & Co., 128 Iowa 72, 74, 76, 102 N.W. 814, 815, 5 Ann. Cas. 960, the subject of correct selection of remedies, and the fact that the wrong remedy was selected and the real remedy still existed, were considered, and the court stated as follows:

"Where but one remedy exists the unavailing effort to enforce another does not constitute an election or estoppel which prevents a resort to the proper action. This distinction is upheld by the authorities generally, and has often been reiterated by this court. \* \* \* 'The institution by a party of a fruitless action which he has not the right to maintain will not preclude him from asserting the rights he really possessed.'

\* \* \* 'There is a difference between an election of remedies and a mistake of remedy, and the law has not gone so far as to deprive parties of meritorious claims merely because of attempts to collect them by inappropriate actions upon which recovery could not be had.' "

While it was a long time between the death of Miss Bennett and the institution and trial of the case at bar there is no evidence in the record that plaintiff ever abandoned his cause of action. He started out by telling Mr. Olson, the administrator of Miss Bennett's estate, that he had a claim to the property. He had his attorneys write a letter to Mr. Olson tendering the money and demanding a deed in 1952. No compliance was made as to his demand. He then had his attorneys start an action in 1953. True, the form of the action was wrong, but at least it was evidence that he did not abandon his claim to the farm. Immediately after the court held the quieting-title action was a wrong form of procedure he tendered and deposited the money required under the agreement in the office of the clerk of the District Court. His attorney mailed a notice at the same time to defendant Mrs. Olson notifying her of the deposit and demanding a deed. He never received the deed. Therefore, in 1958, he commenced the action at bar. This is not a history of abandonment and no error was committed by the trial court in refusing to dismiss the action because of abandonment.

II. Appellants' next assignment of error is that plaintiff is not entitled to specific performance because he has not performed his part of the agreement.

The agreement is separable. One section of the agreement pertains to plaintiff's right to secure deed for the land upon the payment of $2000 and interest. The other pertains to the management of the farm.

 As to the first section there was never any failure to perform. Plaintiff tendered Mrs. Olson the $2000 and interest through a letter from her attorney in 1952 and demanded a deed. She failed to comply. Appellants' argument as to plaintiff's failure to perform is directed to the management of the farm. This would not be applicable to the purchase section of

the agreement, but even if it were applicable, plaintiff performed the agreement as to the management as far as possible.

From 1941 to 1950 he managed the farm in a manner completely acceptable to Miss Bennett. While it is true that he did not file a formal statement of all receipts and expenditures on February 1 of each year, this was largely due to the fact that after he had such statement typewritten and submitted to Miss Bennett the first year, she told him that it would not be necessary to do so thereafter. The trend of the testimony is that they would meet each year, compute the expenses, and divide the net income. In December of 1949 Miss Bennett wrote him from Miami, Florida, thanking him for the money. In the preceding month he had mailed her a check for $766.33, which was marked "Full to date", and she not only accepted such check, but in August of 1950, five months before her death, she wrote him thanking him for his good work in taking care of the farm.

Appellants' complaint seems to be directed largely at a claimed failure of plaintiff to manage the farm in 1950, 1951 and 1952. It seems from the record that Mr. Olson took over the farm and the management in 1951, after Miss Bennett's death on January 7 of that year. At any rate, when Miss Bennett died there was a crib of corn on the farm representing the 1949 and the 1950 crop of corn. Mr. Olson took possession of the corn and sold it for $720. He made report of the return from this corn in his inventory in the estate of Mabel Bennett in Cass County. The inventory also shows he received $20.95 for Iowa Land Tax Credit refund.

According to his own testimony he collected the 1951 rent. It was not very much because the year was dry and the crops were not good. He received a total of $454 from which he deducted $152 for expenses leaving $302 net received by him. In his testimony he also makes report with reference to the years from 1952 to 1958 inclusive.

There was no breach on the part of plaintiff as to the $2000 invested by Miss Bennett because he tendered it all the way from 1952 to 1957 when he paid it into court. There was no breach on his part as to the management for the years 1950, 1951

and 1952 because the administrator of Miss Bennett's estate took charge.

III. Appellants' counsel entered into a somewhat detailed argument as to claimed error III which he denominates as a purchase of the property by defendant Marjorie J. Olson, for valuable consideration, free and clear of the provisions of plaintiff's agreement.

Miss Bennett's two sisters deeded their interest to her sister Bess M. Pedersen in July of 1952, and Mrs. Pedersen deeded under a joint tenancy deed to herself and Marjorie J. Olson, her daughter, on July 17, 1952. Bess M. Pedersen died and apparently, from the testimony, Mr. and Mrs. Olson paid the expenses of her last illness and her funeral expenses. They claim the deed to Mrs. Olson was executed under the consideration of their care for her during the remainder of her life.

Such deed was not executed free of notice of plaintiff's claim and agreement. As heretofore shown, plaintiff filed a notice under section 614.17 of the Iowa Code as to his claim to the property, on January 3, 1952, which was prior to the time of the actions between Miss Bennett's heirs in getting the record title into the name of defendant Marjorie J. Olson. Appellants claim that under section 558.41 the earlier notices were not of value, but such claim is not effective as to the statement filed by plaintiff on January 3, 1952, under the provisions of section 614.17. If defendant Marjorie J. Olson did not have actual notice of the facts set out in the statement, she had constructive notice and was bound by such notice. This alleged assignment of error is not a basis for dismissing plaintiff's petition.

IV. Under the fourth assignment of error appellants claim that the agreement is unconscionable, inequitable and unfair, and should not be enforced by a court of equity.

The general theory is well known and is recognized in courts of equity, but the difficulty with appellants' claim is that the facts do not sustain the allegation.

It is true that when this farm was purchased in 1940 Miss Bennett furnished all the money for the purchase. However, plaintiff had a very important and valuable part in the trans-

action. He sought out the farm and bought it. It was apparently a good buy in view of what he could do with the farm. He proceeded to rehabilitate the farm. He personally removed stones scattered around on the farm. He cut out brush. He seeded part of it down to make a change of crop. He arranged to fertilize it extensively and he continuously and carefully cared for the farm from 1941 until Miss Bennett's death in 1951. The success of the project was due as much to his care and attention as it was to the fact that she put her money into the farm.

Furthermore, she made a very advantageous investment both for herself and defendants. In the first place she got 3% on her money all through the years up until the time plaintiff deposited the $2000, plus $480 interest for eight years. In addition thereto she received one half of the net income for the ten years she lived after the farm was purchased. Defendants will have one half of the income from the time of her death up until the trial of the case, which is approximately another nine years. There is not a full disclosure in the record as to what the income was from 1941 to 1949, but we know in that year she received a check for $766.33. We also know as we will set out hereinafter that during the nine years Mr. Olson had charge of the farm, defendants received $1782.92 in income. In other words, there is no question but what Miss Bennett and her successors in interest received in income considerably more than the $2000 which was originally invested by her in the farm. In addition to this her successors in interest will now receive back the $2000 plus interest.

Appellants place great weight on the fact that the farm has greatly increased in value and is now worth approximately $100 per acre. This is true; but this is due to the general prosperity of the years we have gone through recently and not to any overt actions on the part of plaintiff.

The fairness of an option agreement is to be judged under the conditions which prevail at the time the option is given. 91 C. J. S., Vendor and Purchaser, section 6; Larson v. Smith, 174 Iowa 619, 626, 156 N.W. 813, 815.

In Larson v. Smith, supra, the court said: "This matter is to be determined not as of the date when it was finally exercised, but upon the situation as it existed when the contract was entered into. The future could not then be foretold. It was reasonable to suppose the lands would continue to advance, but no one could know that to a certainty."

Specific performance of a contract will not be refused because of the fact that the value of the property contracted for increased through economic conditions until the time of performance. Larson v. Smith, supra; King v. Raab, 123 Iowa 632, 99 N.W. 306; Peterson v. Chase, 115 Wis. 239, 91 N.W. 687; Anderson v. Anderson, 251 Ill. 415, 96 N.E. 265; Martin v. Toll, 196 Iowa 388, 391, 192 N.W. 806, 807.

In Larson v. Smith, supra, it is also stated: "The optionee is entitled to the rise in value of the lands."

In Martin v. Toll, supra, the court stated: "If the contract price had been unconscionable and inequitable as of the time the contract was made, it would appeal to the discretion of the court of equity as a reason for refusing specific performance. Yet this rule has no application to a case where fluctuations in value subsequent to the contract result in loss to one of the parties and in corresponding profit to the other. All contracts of purchase and sale are made in contemplation of future fluctuation in value."

There was no overreaching on the part of plaintiff nor was there any unconscionable, inequitable or unfair dealings on his part.

V. Appellants allege the court erred in making an accounting between the parties as to rental collections, some of which were made by plaintiff, and some by defendants.

It is true that plaintiff did not specifically refer to an accounting in his petition for specific performance. This is an equitable action and in the prayer plaintiff prayed "that the plaintiff be granted such other further and complete relief as this court may deem just and equitable in the premises." In order to avoid a multiplicity of suits the trial court was not only authorized, but was justified in making accounting as

between the parties as to the rental situation growing out of the farm.

Appellants also contend that if an accounting was to be made, the accounting as made by the trial court was not correct and that the court should have only allowed $498.17 in favor of plaintiff and that from this amount they claim a balance due on his $500 promissory note, of $435.75, should be deducted from the rental balance.

In reading the record we find that plaintiff is entitled to $1013.65 in connection with the accounting as to rental collections made by plaintiff and defendants. It is our position that defendants should be given credit for the balance due from plaintiff on a note of $500 which he gave to Miss Bennett on March 5, 1946.

The rental situation is as follows: Appellant Mr. Olson collected $740.95 in land tax credit and sale of corn which had been grown in 1949 and 1950. According to his own testimony he collected $302 in 1951; $9.52 in 1953; $469.09 in 1954; $305.92 in 1955; $507.30 in 1956; $418.12 in 1957; $261.19 in 1958; this is a total collection of $3014.09. However, he had a loss in 1952 of $217.52, leaving $2796.57. Plaintiff collected in 1953 from the sealing of corn and wheat the sum of $769.27. This makes a total net rental collection for the nine years of $3565.84. One half of this would be $1782.92. Since plaintiff has already received $769.27, he has a balance coming of $1013.65 as his share of rental collections.

The trial court suggests that perhaps after plaintiff made his deposit of the $2480 in the office of the clerk of the District Court, in 1957, he should have all of the rent, less reasonable management deduction. However, the court does not divide the matter on said basis, but permits defendants to retain one half of the rental. We believe this is equitable and fair. The program was established as between plaintiff and Miss Bennett on the basis of a fifty-fifty division and it should be concluded on that basis.

There is a suggestion in appellee's argument that the court made no allowance for the note of $500 executed in 1946, because in 1949 plaintiff gave a check to Miss Bennett for $766.33

which was marked in full. However, after Miss Bennett died, plaintiff admitted he owed this note and on September 16, 1951, he made a payment on the note of $274.12. Since we are making an accounting in favor of plaintiff as to the rent, we should also include an accounting in favor of defendants as to this note.

Computing the interest at 4%, as fixed in the note for the time it ran, as to the two various amounts owing, the note and interest total $684.53. Deducting the $274.12, which plaintiff paid, leaves a balance on the note of $410.41. Deducting this from the rental item of $1013.65, leaves a balance due from appellants to appellee of $603.24. The trial court held there was $747.82 due. The difference is small, but we will modify the court's computation to establish the amount at $603.24 to be deducted from the money on deposit.

■ VI. Appellants contend the court erred in not dismissing the case, because the agreement terminated upon the death of Mabel Bennett.

Appellants cite some authorities, but the general provision in such authorities is that there should be shown in the agreement, or in the actions of the parties, a plain intent that the agreement should not extend beyond the death of either party. Any such intention in the agreement involved in the case at bar is absent. The agreement extended for twenty years, and did not expire until July 15, 1961. There was no such intent shown on the part of plaintiff, because he has been pursuing some remedy ever since Miss Bennett died. In 1941 Miss Bennett wrote a letter which shows clearly that she had no intent that the agreement should expire with her death. In the letter she said: " Now Louis, you let me know just how much money you have paid toward the farm, so that I can have a statement drawn up to give you. I think it should be done soon *for you know life is very uncertain.*" (Emphasis ours.)

The matter has been considered in several cases in Iowa. We have held that an option such as plaintiff holds does not lapse by the death of the optionor, and is binding on his successor in interest. Peterson v. Chase, 115 Wis. 239, 91 N.W. 687; Mueller v. Nortmann, 116 Wis. 468, 93 N.W. 538, 96 Am.

St. Rep. 997; Inghram v. Chandler, 179 Iowa 304, 314, 161 N.W. 434, 437, L. R. A. 1917D 713.

In the Inghram case, supra, the optionor died and the action arose because of peculiar provisions of his will. This court said: "* * * The rights of Dunn are in no manner affected by the question whether the farm passed as realty in the first distribution or otherwise. Whichever way it passed, he was no less entitled to exercise his option."

In Mueller v. Nortmann, supra (page 470 of 116 Wis.), the court said: "If the contract was one the intestate could not have revoked in his lifetime, then his heirs or legal representatives have no greater right. Raesser v. Nat. Ex. Bank, 112 Wis. 591, 88 N.W. 618. His death did not revoke the right of the buyer to make his election within the time limited."

In the case at bar the right which plaintiff had to exercise his option did not expire at the death of Miss Bennett.

VII. This case should be closed. Mabel Bennett departed this life eleven years ago. During the intervening years it has been in the courts either through administration, or through cases pending, far beyond the normal time for settlement of matters of this type. In order to expedite closing of the case we provide that the trial court shall file an amendment to its decree, providing that a commissioner be appointed to execute and deliver deed conveying the farm involved in this action to plaintiff if defendants do not act promptly. If defendants have not executed a deed and placed it in the hands of the clerk of the District Court of Cass County within fifteen (15) days after the filing of the procedendo herein, the trial court shall order such commissioner to execute deed to plaintiff conveying the farm to him. When deed has been delivered to plaintiff, the sum of $603.24 shall be paid to plaintiff, and after deducting the court costs in the District Court and in this court, the clerk is authorized to pay the balance of plaintiff's deposit to defendants.

The trial court is correct in saying there are certain rentals for which defendants should account to plaintiff which could not be fixed at time of trial and cannot be fixed now. The last year covered by the decision of the trial court and by this

decision was 1958. Defendants will owe plaintiff one half of the net income from the farm for the years 1959, 1960 and 1961. They should account to plaintiff and make payment to him of such amount. The case is modified as to accounting; otherwise affirmed.—Modified and affirmed.

All Justices concur except Bliss, J., not sitting.