C. W. KINSER, Appellant, v. C. L. McMURRAY et al., Appellees.

CONTRACTS: Performance by Other Parties. A contract that a buyer of sheep will raise a flock of sheep therefrom, and that the seller

will purchase the wool from such flock as soon as the buyer gets said sheep sheared in a named year, involves no such element of reliance on the personal skill of the buyer as to prevent the assignment or subletting of the contract to other persons who are equally competent.

*Appeal from Wayne District Court.*—H. K. Evans, Judge.

March 8, 1921.

Action brought at law to recover damages because of the alleged breach of a contract in the sale of wool, which defendants refused to accept. During the trial, plaintiff asked a reformation of the contract; and, by agreement of parties, the cause was transferred to the equity docket, the jury was discharged, and, by agreement, the case was tried to the court without a jury. The trial court found that the equities were with defendants, and dismissed plaintiff's petition, at his costs. Plaintiff appeals.—*Reversed.*

*Howell, Elgin & Howell* and *H. F. Garrett,* for appellant.

*Miles & Steele, Poston & Murrow,* and *Carter & Bracewell,* for appellees.

Preston, J.—Plaintiff is a farmer, but had not had experience in raising sheep, except that, the year before the contract now in controversy, he had taken a smaller number of sheep from one of the defendants on similar terms, and had performed the contract satisfactorily. On July 7, 1918, plaintiff and defendants endeavored to negotiate the purchase and sale of about 400 sheep then in the railway stockyards at Corydon, Iowa. The negotiations failed of completion at that time, but later the same day, defendants came to plaintiff's home near Promise City, some 15 miles from Corydon, and renewed the negotiations. After some discussion, the negotiations were transferred to the bank in Promise City, where, after some further negotiations, the contract sued upon was executed and signed by the parties. It bears date June 17, 1918, and is as follows:

"This contract entered into by and between C. W. Kinser of Promise City, Iowa, and C. L. McMurray and M. A. Scott and

Henry Morris, all of Corydon, Iowa, this 17th day of July, 1918. For and in consideration of 15 cents per pound, C. L. McMurray, M. A. Scott and Henry Morris sells and conveys to C. W. Kinser around 400 short-mouthed ewes, but no broken mouths; ewes to be weighed at Corydon July 17, 1918, as soon as Kinser arrives. Kinser is to take these sheep, breed and raise a crop of lambs from them, and when said lambs arrive at age and size that they weigh 85 pounds average, McMurray, Scott, and Morris agree to buy them delivered at some local stockyards at 16 cents per pound; lambs to be started in the morning and weighed at local stockyards; lambs to be trimmed and docked. McMurray, Scott and Morris further agree to buy the 1919 crop of wool off these ewes to be delivered and weighed at Promise City, Iowa, as soon as Kinser gets said ewes sheared in spring of 1919, and pay for the same at 80 cents per pound.''

The only controversy in this case is over the sale of the wool referred to in the last paragraph. The contract was drawn by a lady in the bank. As said, plaintiff during the trial claimed that, in some respects, the contract did not express the real agreement of the parties, and asked reformation. The trial court seems not to have passed on the question of reformation, except that the petition was dismissed. This matter will be referred to later, if it appears necessary. Plaintiff paid defendants about $4,000 for the sheep.

On September 17, 1918, plaintiff made a similar written contract with W. E. Walker, a farmer, who, for the consideration of $1,400, agreed to take 100 of the same sheep, ''breed and raise a crop of lambs from them, and when said lambs arrived at age and size of average of 85 pounds, Kinser agrees to buy them delivered at some local stockyard, to be drove at least two miles immediately before weighing, at 16 cents per pound; the lambs are to be trimmed and docked. C. W. Kinser further agrees to buy the 1919 crop of wool off these ewes to be delivered and weighed at Promise City, Iowa, as soon as Mr. Walker gets said ewes sheared in spring of 1919, and to pay for same at 80 cents per pound. Wool to be free from cuckleburs.''

On the same day, plaintiff and C. C. Walker, a farmer, executed a contract like the one last referred to, except that the consideration was $2,100, and this Walker was to take 150 of the

ewes. Defendants knew of the arrangement between plaintiff·
and the Walkers soon afterwards, and made no objection thereto.
One of the defendants testifies:

"A short time after Kinser sold the sheep, I knew of it. I
never went to him or objected, or kicked about it. I didn't go to
Kinser: what difference does that make to me?"

The Walkers took the sheep, and the next spring delivered
the wool from the same sheep to plaintiff, who paid them therefor,
in accordance with the terms of the contract. On June 30, 1919,
plaintiff notified defendants by letter that he had their wool
ready, under the contract, and asked them to take it by the next
Saturday or Monday. In response to this, and on July 3, 1919,
defendants wrote plaintiff as follows:

"Dear Sir: We are in receipt of your notice of 30th ult.
that you have wool ready for us. In reply we beg to say that we
will not receive or accept the wool you refer to."

At this time, when the letter was written, defendants did not
know that some of the wool was from dead sheep, as they now
claim. They say they did not discover that fact until about
the middle of August. At the time the letter was written, de-
fendants made no claim to plaintiff that the contract was per-
sonal to plaintiff. They gave no reasons for their refusal.
Plaintiff's evidence is to the effect that, during the negotiations
for the contract between himself and the defendants, it was
agreed in fact, and contracted, that plaintiff should have the
privilege of putting out the sheep by resale or otherwise, provided
he did not put them out in bunches less than carload lots, as de-
fendants claim, and not less than 50 each, as plaintiff claimed;
and he contends that, having that privilege, he did not violate
the contract in letting the sheep out in two bunches of 100 and
150 each. As we understand the record, however, this last evi-
dence went in on the question as to the reformation of the con-
tract, after defendants had pleaded the personal feature thereof,
and its nonassignability. After defendants had so pleaded,
plaintiff asked reformation, and alleged that there was no per-
sonal feature in the contract; that defendants, by their actions
and conduct, had waived such feature of the contract, if it was

so, and that defendants were estopped from asserting that the contract was unassignable, or that it was a personal contract, because they knew of the arrangement with the Walkers, and that, as said, plaintiff was to have the privilege of putting out the sheep. Defendants testify that, when the question came up as to entering into the 1918 contract, they went to plaintiff's farm and investigated the matter, and became satisfied that he had the ability, skill, and honesty to take care of the sheep. We do not understand defendants to claim, or that their evidence shows, that the Walkers were not as competent sheep raisers as plaintiff, or that they were not equally trustworthy and honest. This, doubtless, is not the test in all cases, especially where special skill is required. Defendants do claim, however, that some of the sheep let out to the Walkers had died, and that the wool therefrom was included in that tendered by plaintiff, and that such wool is not as valuable as when sheared from live sheep. But defendants seek to prove such loss of sheep by the assessor's return, which shows a smaller number of sheep assessed than was returned to them. But some assessors are more liberal in such matters than others, so that we do not regard this as satisfactory evidence that sheep were lost. It does appear, however, and plaintiff concedes, that he slaughtered a few sheep, and that the wool therefrom was included in that tendered. We do not find that there is any evidence tending to show that such wool is not good.

1. The more important question in the case, and the one most argued by the parties, is as to whether the contract between plaintiff and defendants was assignable. They treat the contracts between plaintiff and the Walkers as an assignment; though it seems to us that, strictly speaking, it is a question whether it is such, as to plaintiff's obligation in his contract with defendants to deliver the wool as agreed, or defendants' obligation to receive and pay for it. It may be so as to that part of the contract by which the plaintiff let out a part of the sheep to the Walkers. The defendants contend that it is such an undertaking as that it requires special skill, ability, knowledge, and credit, and that plaintiff was employed by them by reason of the trust and confidence reposed in him personally, and that, this being so, it may not be assigned, and that he may not sub-

stitute another to perform his obligations, without the consent of the defendants. Plaintiff contends that the contract was not of that character. Counsel do not seem to differ greatly as to the law, but the question is whether this is such a contract.

In a given transaction, it is sometimes difficult to exclude the personal equation; and it is difficult sometimes, too, to draw a line, and say that such and such a contract or service does or does not involve, to some extent, the matter of personal service. Appellees argue that the matter involved in this case was wool, and that the evidence shows that the quality of wool depends upon the feed and care of the animal from which the wool comes. This is true of many situations where there is such a personal factor as to prevent an assignment. The value of a brick wall in a building would depend upon the manner in which the mortar is mixed and the wall laid. The owner could make a contract with a contractor to build the wall, who might employ a hundred brick masons to do the actual work of laying the wall. Possibly the contractor might not assign the contract as a whole to another contractor, without the owner's consent, and yet, as said, the contractor could properly employ brick masons to do the work. In such a case, the owner would still have the credit and responsibility of the contractor or his bondsmen for the proper performance of the work. In the instant case, it might be necessary for the plaintiff to employ one or more hired hands to assist him in his farm work, including the care of the sheep. Defendants could, notwithstanding, rely upon the credit and responsibility of the plaintiff. One of the defendants testifies:

"I am objecting to the proposition that plaintiff didn't personally clip and care for the sheep. I expected him to do it, when he signed the contract. When I made the contract, I did not have in mind him personally shearing the sheep. I didn't think about him doing the work. To keep and personally supervise the sheep, I think, is what he should have done. I didn't suppose he personally was going to clip the sheep; I didn't suppose he was that kind of a fellow. I didn't have in mind he was going to shear the sheep."

Another testifies that they did not know anything about plaintiff's experience with sheep, except the bunch he had the year before. Though defendants vehemently insist that they

were relying upon the experience of plaintiff in the handling of
sheep, we have some doubt, under their testimony, whether such
was the fact. One of the defendants says that he expected
plaintiff to keep the sheep and deliver the wool and lambs. It
would seem from this, and we think it is the fact, from all the
evidence, that the essence of the contract was the raising of
lambs and the production of the wool, and incidentally, of
course, the care of the sheep. The contract does not specify any
particular standard or quality of wool. This, to some extent,
negatives the thought that the sheep were to have special care
by an experienced sheep man, as bearing upon the quality of
the wool. Had the price of wool advanced to a dollar a pound,
and plaintiff breached his contract with defendants by failing
to deliver the wool, defendants would have their remedy by
appropriate action to recover damages for the breach, or to re-
cover the wool itself. Doubtless, if there had been an advance
in the price of wool, instead of a decline, there would have been
no lawsuit about this matter. Appellees cite *Walker Elec. Co.
v. New York S. B. Co.,* 241 Fed. 569, 574, and like cases. In the
case cited, plaintiffs, though not manufacturers of electrical
machinery, had been supplying such machinery for ships for a
number of years. They were known to be familiar with the
work of that type, and had shown themselves capable of finish-
ing highly technical and involved electric machinery. The court
held that, in dealing with them to furnish switchboards for a
battleship for a design then indefinite, but to which the govern-
ment would ultimately hold the shipbuilder, the shipbuilding
company did not deal with plaintiffs as mere brokers for the
purchase of a staple article, but dealt with them upon a per-
sonal confidence, based upon a previous business and technical
experience; and that the contract was not assignable without
the consent of the shipbuilding company. They cite, also *Sloan
v. Williams,* 138 Ill. 43 (27 N. E. 531, 532), where a lawyer was
employed, who, by the terms of his contract, was required to
make use of his professional skill. The contract itself, upon its
face, did not provide for any assignment of it. The court held
that it is well settled that contracts in which the personal acts
and qualities of one of the contracting parties form a material
ingredient are, in general, not assignable. Such was the rule

laid down by this court in regard to an abstracter, in *Linn County Abstract Co. v. Beechley*, 124 Iowa 126. See, also, *Edison v. Babka*, 111 Mich. 235 (69 N. W. 499.), a contract to plant and trim trees for a period of 10 years; *Campbell v. Board of County Com.*, 64 Kan. 376 (67 Pac. 866), a contract for county printing. Other similar cases are cited. Appellees also cite *Boston Ice Co. v. Potter*, 123 Mass. 28 (25 Am. Rep. 9), a contract for the sale of ice; but that case is criticized, if not overruled, by the intimation that the case goes too far in the application of the principle, in *Atlantic & N. C. R. Co. v. Atlantic & N. C. Co.*, 147 N. C. 368 (125 Am. St. 550). There is nothing in the contract in the instant case prohibiting an assignment thereof. Such a provision could have been inserted. We are cited by appellees to Code Sections 3044 and 3046. The first section provides that:

"Bonds, due bills, and all instruments by which the maker promises to pay another, without words of negotiability, a sum of money, or by which he promises to pay a sum of money in property or labor, or to pay or deliver any property or labor, or acknowledges any money, labor or property to be due, are assignable by indorsement thereon, or by other writing, and the assignee shall have a right of action thereon in his own name, subject to any defense or counterclaim which the maker or debtor had against any assignor thereof before notice of such assignment."

The second provision provides that:

"When by the terms of an instrument its assignment is prohibited, an assignment thereof shall nevertheless be valid, but the maker may avail himself of any defense or counterclaim against the assignee which he may have against any assignor thereof before notice of such assignment is given to him in writing."

Section 3443 provides that:

"All causes of action shall survive and may be brought notwithstanding the death of the person entitled or liable to the same."

Under this statute, it has been held that all causes of action which survive are assignable. *Gray v. McCallister*, 50 Iowa 497. A cause of action for injuries to stock may be assigned, and the

assignee may recover the double damages allowed by the statute to the owner. *Everett v. Central Iowa R. Co.*, 73 Iowa 442. A verbal assignment of a chose assignment is valid. *Semour v. Aultman*, 109 Iowa 297. In 5 Corpus Juris 850, we find this doctrine:

"Generally, the test applied in determining the assignability of a chose in action is whether or not it would survive and pass to the personal representative of a decedent. If it would so survive, it may be assigned, so as to pass an interest to the assignee, which he can, in most jurisdictions, enforce in his own name. If it does not so survive, it is not assignable, either at law or in equity."

And at page 883 of the same volume, in reference to contracts for personal service, it is said that:

"The mere fact, however, that a contract calls for the performance of labor or service is not sufficient to render it non-assignable, if, from a consideration of the entire contract, it appears that only a certain result was contracted for, and not the personal labor of the promisor. Money due under a contract for personal service can be assigned, notwithstanding that the contract itself is not assignable."

May it not be said that, under this contract, defendants were seeking results; that their sheep should be cared for, lambs raised, wool sheared and delivered to them at a certain time and place, and for a certain price? It seems to us this must be so. Again, suppose plaintiff had died after the making of the contract,—say, for instance, after the sheep had been sheared and the wool was ready for delivery,—defendants would, under their contract, be entitled to recover the wool or its value from plaintiff's estate. Property was involved, rather than the mere personal service alone, as in the employment of a lawyer or the like.

Digressing a moment, it should be said that the parties may, of course, assent to the assignment of an executory contract, and a party may ratify an assignment or waive a provision against assignment or be estopped to set up his nonconsent. Thus, in 5 Corpus Juris 884, it is said:

"A party may be estopped to set up his nonconsent to an assignment when, by his own conduct, he has induced the assignee to take the assignment; and the acts and conduct of a

party to a contract, with knowledge of the fact that the contract has been assigned, may be such as to warrant the conclusion that the provision against its assignment has been waived."

See, also, *Chapin v. Longworth,* 31 Ohio St. 421; *Staples v. City of Somerville,* 176 Mass. 237 (57 N. E. 380); *Galbreath v. Wallrich,* 45 Col. 537.

Numerous other cases are cited by appellant, some of which will be referred to. In *Northwestern C. & L. Co. v. Byers,* 133 Mich. 534 (95 N. W. 529), a company agreed to erect and operate a stave factory, as long as the supply of timber might warrant, etc., the site for which was to be furnished by defendants. Held that the contract was assignable by the company. The court said:

"Nor can it be said that the personal performance by the Buckeye Stave Company could have been contemplated by the parties at the time this contract was made. It was a corporation, and must work through its agents, servants, and officers. The work, of necessity, required the labor and attention of a number of men; and it does not appear that, because of the company's knowledge, experience, or pecuniary ability, or for any other reason, it was especially fitted to carry it on. There was nothing of a personal nature about it, and a personal performance by it was not the inducement, nor the essence of the contract. If the contract be personal, and the performance of the party himself be the essence thereof, it neither devolves upon his representatives, nor can it be assigned. * * * The true doctrine is that, where an executory contract is not necessarily personal in its character, and can, consistent with the rights and interests of the adverse party, be fairly and sufficiently executed as well by an assignee as by the original contractor, and when the latter has not disqualified himself from a performance of the contract, it is assignable."

In *La Rue v. Groezinger,* 84 Cal. 281 (18 Am. St. 179), a contract for raising grapes, the court said that the vineyard was the same, and the vines were the same, and the crop was from vines planted by the assignor, and further:

"We cannot see any reason that would make this contract nonassignable, which would not equally apply to the ordinary crops of corn, wheat, oats, potatoes, etc."

Contracts on the following subjects have been held assignable: Public printing (*Carter v. State,* 8 S. D. 153 [65 N. W. 422]); dies and lanterns (*Rochester Lantern Co. v. Stiles,* 135 N. Y. 209 [31 N. E. 1018]); sweeping streets (*Devlin v. City of New York,* 63 N. Y. 8); drilling oil well (*Galey v. Mellon,* 172 Pa. 443 [33 Atl. 560]). Many other cases are cited by appellant, but we shall not take the space to cite them further. The above are fairly illustrative of instances where contracts are not of a personal character, and are assignable.

This disposes of the vital point in the case, and we deem it unnecessary to notice the question as to reformation, or other collateral points suggested.

2. The testimony shows that wool from the few sheep that were slaughtered was all right. Indeed, one of the defendants testified:

"The wool from sheep that have been butchered would probably be all right."

We have already indicated that little account should be taken of defendants' claim that wool from other dead sheep was in that tendered. From the entire record, we think there was a substantial compliance by plaintiff with the contract as to the wool, and that he is entitled to recover therefor. The witnesses as to the value of wool the last of June and first of July, 1919, when the wool was to be delivered, and when it was tendered, vary somewhat in their testimony. One puts it at 40 cents to 60 cents per pound; another, 40 to 53 cents; two others, at 50 cents; and one of them says the average would be 50 cents. We think the evidence fairly shows that it was worth 50 cents. The contract price was 80 cents. There were 1,667 pounds of the Walker wool, and 930 pounds from the sheep retained by plaintiff,—in all, 2,597 pounds. We think plaintiff is entitled to a judgment for that number of pounds at 30 cents a pound, or $779.10. The case was tried in equity, and *de novo* here. The cause is reversed and remanded, with directions to enter judgment for that amount, with interest at 6 per cent from July 3, 1919.—*Reversed.*

EVANS, C. J., WEAVER and DE GRAFF, JJ., concur.