IN RE ESTATE OF GEORGE W. GROOMS.

MARTIN HARDSOCG, Appellee, v. IDA GROOMS, Administratrix, et al., Appellants.

EXECUTORS AND ADMINISTRATORS: Management of Estate—Application to Continue Business—Jurisdiction. A lessor who voluntarily appears in probate and *successfully* objects to the application of the lessee's administrators for an order authorizing the continuation of the business covered by the lease may not thereafter assert that the refusal of the court to grant the application was discretionary with the probate court, and that, in any view, the court had no jurisdiction to grant the application.

LANDLORD AND TENANT: Leases—Assignability—When Lease Survives Death of Lessee. A lease which requires the lessee to diligently farm a portion of the land and to "vigorously utilize" a portion of said land "*by extraction of the available sand and gravel*" thereon is assignable, and survives the death of the lessee, it appearing that the lease was entered into without reliance on any particular personal fitness of the lessee.

EVANS, C. J., dissents.

LANDLORD AND TENANT: Leases — Forfeiture — Non-contract Grounds. A lease may not be forfeited on a non-contract ground.

Headnote 1: 15 C. J. pp. 992, 1021. Headnote 2: 35 C. J. pp. 975, 1053. Headnote 3: 35 C. J. p. 1063.

Headnote 2: 16 R. C. L. 828.

*Appeal from Wapello District Court.*—FRANCIS M. HUNTER, Judge.

NOVEMBER 15, 1927.

The administratrix of the estate of George W. Grooms, deceased, applied to the probate court for authority to continue the business of removing sand and gravel, under a lease made by Martin Hardsocg to deceased. The heirs join in the application. The lessor, Hardsocg, filed objections, which the district court sustained. The administratrix and heirs appeal.—*Reversed.*

*Gillies & Daugherty,* for appellants.

*Chester W. Whitmore,* for appellee.

MORLING, J.—I. The lessor now urges that the court below neither as a court of probate nor of chancery had jurisdiction to entertain the application, in that "authority to carry

1. EXECUTORS AND ADMINISTRATORS: management of estate: application to continue business: jurisdiction.

on the contract was not asked as an incident of the administration of the estate, to close up the obligations connected with both the gravel business and the administration." He says that "Grooms himself had not left any will authorizing his business to be carried on after his death," and that the estate would have to be kept open for 19 years. It is said that the application was addressed to the discretion of the court, and that such discretion was properly exercised.

The lessor does not claim the status of a creditor. He volunteered in the proceedings for administration, setting up his alleged rights under the contract. He asked "an early hearing upon the application and these objections, that the rights of the parties may be speedily determined, as the season for gravel work is now opening up," etc. His voluntary tender of an issue was accepted. At the trial it was stipulated that:

"In order that no question as to the jurisdiction of the probate proceedings may be involved, it is now stipulated and agreed that this cause shall stand, and it is now tried and submitted to final hearing at this time as in chancery."

The parties voluntarily submitted to the judgment of the court their respective rights under the contract. The court found:

"All parties in open court agree that the hearing now had is upon the merits, and that the decision thereupon shall be final in this court. * * * That said lease constituted a personal contract between the parties, and terminated with the death of said George W. Grooms. By reason whereof it is now ordered" that the objections of the lessor be sustained, and application denied.

The district court is a court of general jurisdiction. It had jurisdiction of the subject-matter and of the persons of the parties. The parties in interest, according to the record, were the administratrix and the distributees. The claimant, whose rights to intervene are not above question, having procured a denial of the application, and seeking to retain the benefit of it, has no standing to deny the jurisdiction, or to assert that the order was a discretionary one in probate.

II. The lessor's principal insistence is that the lessee's rights under the lease were personal to him; that the contract was personal, not assignable, and did not survive to the ad-

2. LANDLORD AND TENANT: leases: assignability: when lease survives death of lessee.

ministratrix or distributees. The lease is of 35 or 40 acres, lying astride the Des Moines River, and subject to overflow. It leases to "Grooms the surface use, and the sand and gravel rights in and to, and riparian and other rights incident to the following" premises, for five years from March 1, 1925. It provides that, "should Grooms make substantial investment in equipment and machinery installed on the property, he" shall, upon notice, have the right to extend the lease for fifteen years, upon the same terms.

"Purposes. Grooms covenants to vigorously utilize said land by extraction of the available sand and gravel resources and diligently farming the remainder of the available land described; and failing in which for a period of ninety days during the active season for such pursuits, this lease at the option of said Hardsocg may be declared terminated; the duty devolving on said Grooms hereunder to clear said land of brush," etc.

Grooms was required to pay taxes.

"The said Hardsocg leases said land to said Grooms for said purposes and on said condition, and grants unto him the sole and exclusive right during the term to extract from such land, adjacent river banks and bed, remove and sell the avail-

able sand and gravel, on condition that Grooms pay to Hard-socg Royalty of ten (10c) per yard, or seven cents (7c) per ton for all sand or gravel so extracted or removed from said described property, including the adjacent river bed, during the term."

The payments were to be "accompanied by itemized statement verified by Grooms furnished to Hardsocg showing the basis on which such earnings are calculated. Hardsocg, during the term shall have the right at any time to examine the records of Grooms as to accuracy of the returns. Rights of Grooms are exclusive. The rights herein granted unto said Grooms are exclusive in him."

Grooms had the right to make roads, to install "such machinery and equipment as he may desire for the purpose of operation; and shall have the right to alter or remove the same at will," subject to landlord's lien.

"Rent Contingently Modified by Royalties. Grooms covenants to fully utilize all available part of the land so rented by diligently prosecuting in season both the farming operations and the sand and gravel business herein provided for. If the royalties in any one year do not amount to three hundred dollars, then the landlord shall have a lien upon that part of the crops raised on the west side of the river, the amount of the lien being for one half the crops and proceeds thereof, raised on the land west of the river, so far as such amount shall be necessary to make good such deficiency in the royalties. And if the royalties paid in any one year aggregate five hundred dollars, then all the crops and proceeds * * * shall belong to Grooms free from any claim by Hardsocg."

The lessor reserved all minerals, and the right to sell building lots and to erect structures not interfering with the roads or buildings of Grooms. "Grooms has the right at the end of the term to remove improvements" and equipment. It was agreed that a cement-block house on the property was included in the lease, but to be maintained at Grooms' expense.

The circumstances attending the making of the lease are very meagerly shown. Hardsocg testified that he had lived in Wapello County 40 years; that Grooms worked for him three or four years, when Hardsocg first came to Ottumwa, and worked for him again three years ago; that Grooms' duties were "to

keep accounts and fill orders for me.'' The lease is dated February 25, 1925. Grooms died February 25, 1926. Hardsocg testified that the cement house "was occupied last year by a man—I don't know his name—who did some hauling of sand, part of the time. He done some stripping on the place, with the understanding that he could live in the house. * * * Grooms did not furnish any tools or equipment on the land. He didn't do anything on the place except to wait on customers who were wanting to buy sand and gravel.'' He further testified that he "was somewhat acquainted with Mr. Grooms' financial condition at the time he made the lease, and I knew that he had no means with which to buy machinery. I never complained to Mr. Grooms because he didn't buy any machinery.'' He said he knew that Grooms lived in a rented house,—didn't know whether he owned a team, and did not inquire, before he made the lease; that Grooms paid him $300 royalty, at different times; that Grooms had to strip about seven feet to get the sand; that he got some out of the river bed; that he didn't know of anyone's going there for sand last year that couldn't get it. There is evidence that 15 acres was in cultivation under sublease from Grooms; that Grooms paid out $477.58 for repairs, etc., besides royalty, $219.59 (Hardsocg says $300); that Grooms derived from all sources, unless from crop, $1,162.54.

Where a contract is of such nature that for its proper performance, as contemplated thereby, confidence and trust are reposed in the performer personally, or where the attainment of its object requires his personal services or skill, it is not assignable, and does not survive; but where results are contracted for, and their attainment does not depend upon personality of the doer, where it does not appear that personality is an essential consideration, and the object may be attained by one person as well as another, the contract is assignable, and survives. *Kinser v. McMurray*, 190 Iowa 1329; *Bull v. Weisbrod*, 185 Iowa 318; *Galey v. Mellon*, 172 Pa. St. 443 (33 Atl. 560); *Devlin v. Mayor*, 63 N. Y. 8; *New York Bank Note Co. v. Hamilton B. N. E. & P. Co.,* 180 N. Y. 280 (73 N. E. 48); *Northwestern Cooperage & Lbr. Co. v. Byers*, 133 Mich. 534 (95 N. W. 529); *Atlantic & N. C. R. Co. v. Atlantic & N. C. Co.*, 147 N. C. 368 (61 S. E. 185, 125 Am. St. 550, 23 L. R. A. [N. S.] 223, 15 Ann. Cas. 363); *Hunt v. Dederick*, 105 Ind. 555 (5 N. E.

710) ; 5 Corpus Juris 878 *et seq.* The right of everyone to choose with whom he will contract does not determine the question of assignability. That right exists in the contracts that are assignable, as well as in those that are not. The lessor contends that a lease upon shares is personal, and not assignable. In *Randall v. Chubb,* 46 Mich. 311 (9 N. W. 429), a lease upon shares gave to the lessee the use of farm implements, and required him to care for and repair them at his own expense. In *Lewis v. Sheldon,* 103 Mich. 102 (61 N. W. 269), it does not appear that the use of personal property was included. In these cases the leases were held to be personal, and non-assignable. In the latter case it was said further that the doctrine had become a rule of property in Michigan. In *Meyer v. Livesley,* 45 Ore. 487 (78 Pac. 670, 106 Am. St. 667), a lease of a hop yard, including the use of personal property, was held to have been seemingly made in reliance upon the ability, character, and skill of the lessee, and was not assignable. This was reaffirmed in *Myer v. Roberts,* 50 Ore. 81 (89 Pac. 1051). See *Bates v. Georgia Fertilizer Co.,* 144 Tenn. 32 (229 S. W. 153). In the contract before us the lessor made no provision forbidding the assignment. Here, the promise and the obligation were "to vigorously utilize said land by the extraction of the available sand and gravel resources and diligently farming the remainder." The lessor had no interest in the crop, further than a lien for the minimum royalty. The lessor does not claim, and it does not appear, that the lessee was experienced, or had any special knowledge or skill in utilizing sand banks or in farming. The only duties Grooms had in the course of his former employment by Hardsocg, so far as Hardsocg's testimony goes, were to keep accounts and fill orders. His evidence rather excludes the probability of reliance on the personality of Grooms. The lessor could not, under his testimony, have relied upon the financial responsibility of Grooms, or on any equipment or special qualifications otherwise that Grooms possessed. That Hardsocg did not consider the lease personal seems to be clear from the undisputed evidence that Hardsocg, on the day of Grooms' funeral, "wanted to know what the folks were going to do with the lease," and was told, evidently without any objection, that the son wanted to hold it and work it out. Other witnesses testified, without contradiction, that Hardsocg told one of the sons

"to hold onto that lease over there, because there is more in it than your father ever thought there was, and if I had the money, I would do it myself." This son testifies that he and Hardsocg "talked about those prospective parties that were to see him this spring, and he told me that, if they came to him, he would send them to me. It was understood that I was going ahead and continue to push this thing."

The claimant relies in argument largely on the grant to Grooms in the lease of "the sole and exclusive right during the term to extract," etc.; and again, "The rights herein granted unto said Grooms are exclusive in him." This last is under the heading, "Rights of Grooms are Exclusive." The right was to extract from the land and the river bed, and to remove and sell, the available sand and gravel. By the lease, that right, or those rights, were exclusive in Grooms: i. e., no one else would have or would be given the right to enter upon the land or river bed, to take sand. The purposes were to vigorously utilize the land for sand and gravel and for farming. The duties of Grooms were to clear away the brush and pay taxes and royalty. Such purposes and duties were in no wise dependent upon personality. They could obviously be performed better by one who had financial means and who had credit and equipment, which Grooms evidently did not have.

The question of the assignability of a lease for share rent is not before us for adjudication. The contention by way of argument that it is not assignable is on too insecure foundation to be of value. In *Kinser v. McMurray*, 190 Iowa 1329, 1337, it is said, quoting from 5 Corpus Juris 850:

" 'Generally, the test applied in determining the assignability of a chose in action is whether or not it would survive and pass to the personal representative of a decedent.' "

That case involved a sale of ewes, under a contract by which the purchaser was to raise a "crop of lambs." The sellers were to purchase the lambs and the wool crop at stipulated prices. This contract came much nearer involving the personality of the performer and skill and experience on his part than does the contract now under review. This court said, in that case:

"May it not be said that, under this contract, defendants were seeking results; that their sheep should be cared for, lambs

raised, wool sheared and delivered to them at a certain time and place, and for a certain price? * * * Again, suppose plaintiff had died after the making of the contract,—say, for instance, after the sheep had been sheared and the wool was ready for delivery,—defendants would, under their contract, be entitled to recover the wool or its value from plaintiff's estate. Property was involved, rather than the mere personal services alone, * * * "

The results contracted for here were the vigorous utilization of the land for sand and gravel and diligent farming. Grooms evidently was not even a farmer. The farm was sublet. Hardsocg knew it, and apparently acquiesced.

It would be startling to. the great number of farm tenants in Iowa farming on shares, and to their landlords, to be told that, in the event of the tenant's death,—say, after the spring plowing, or after corn planting, or after the corn is laid by (if none of the crops·are ripe),—the administrator would be under no duty to complete the performance of the lease, and that he or the distributees would have no right to the crop. Under a contract for the leasing of land on shares, the legal title to the entire crop is in the tenant. The share reserved to the landlord is rent. He has no such interest in it as may be in an action against him attached before it is set off to him. His interest up to the time of setting off his share is that of a lien holder, though he may mortgage it. *Rodgers v. Oliver*, 200 Iowa 869, 872; *Clark v. Strohbeen*, 190 Iowa 989, 995; *Riddle v. Dow*, 98 Iowa 7; *Howard County v. Kyte*, 69 Iowa 307. We think that the acceptance of the agreement of the tenant to pay a royalty cannot be assumed to have been made in reliance on the personality of the tenant to any greater degree than the acceptance of an agreement to pay cash rent for a farm, which a supine tenant might not be able to pay. The personality of the tenant would enter as much into his agreement to keep the buildings and fences in proper repair and to keep the land in a proper state of cultivation, free from weeds.

It is said in 40 Corpus Juris 1042:

"Where the personal skill of the miner lessee is contracted for, the lease is not assignable. But where the lease gives the right to mine and carry away ore for a certain time, such lease is not of a fiduciary character or in the nature of a personal

confidence, and ordinarily may be assigned or sublet, unless it contains restriction * * * "

To hold that the element of gauging the rent or compensation to be paid under a contract by the amount of earnings makes it non-assignable and non-survivable would have a far-reaching effect. We are of the opinion that the contract before us is not of a personal nature so as to be non-assignable or non-survivable merely because the amount to be paid upon it by the performer is measured by the amount of his production. The parties in making the contract under consideration had in view the possibility that the lessee would make substantial investments in equipment and machinery, and that such should entitle him to a total of a 20-year term. A minimum royalty enforcible against the crops was provided for. The parties in making the contract had in mind and provided remedies to the lessor. The right of cancellation for failure to vigorously utilize the land was reserved. The lessee was given the right to build roads. The evidence is that the brush must be cut off and stripping done to the depth of about seven feet. There is evidence that such work was done by deceased to the value of $600 to $800. The evidence suggests also the feasability of the installation of a drag line and equipment at a cost of about $2,000, and the prospect of a better market on account of rural paving projects. Plaintiff does not contend that such work and installations involve the personality of the lessee. Suppose that the lessee had cleared and stripped one or two acres and installed a drag line. Suppose he was then taken sick or died. Would it be just or reasonable to say that the lessor's right to compensation on a percentage basis, and to have the lessee keep an account, make the contract personal, so that neither he nor the administrator, creditors, nor heirs have anything to sell but secondhand equipment? The specified reservation of the remedy by terminating the contract for a specified breach, the long term, and substantial investments in view, as well as the declarations of the lessor, the absence of any necessity for, and apparently of the existence of, personal qualifications in the lessee, the character of the work to be done, which might be performed by quite ordinary labor, preclude us from holding that the lease was of such a personal contract as to terminate by assignment or on the death of the lessee.

The parties had in mind, and specifically provided for, the event on the happening of which the lease might be terminated. That event had relation solely to results,—vigorously utilizing the land. It mattered not to the lessor who produced the results. If not produced, whether the failure was that of the lessee or his assignee or administrator, the lessor had the right to terminate. If he had desired to reserve the right to terminate because of the death of the lessor, or for other reason, he could have so provided in the contract. Since he did not do so, it is not for the court to interpolate into the contract, by construction, such a prohibitory provision.

III. Notice of cancellation given by Hardsocg to the widow and distributees recited, as other reasons therefor, Grooms' "not having made investment in equipment contemplated by the lease, and he not having vigorously extracted the available sand and gravel resources as required in the terms of said lease." The lessee was under no contract to make any certain investment in equipment. The lease did not provide, as a ground of forfeiture, omission to make such investment. The right to terminate was by the lease given to the lessor for failure to vigorously utilize the land by extraction of the available sand and gravel resources and to diligently farm the remainder. The right to terminate was conditioned on such failure "for a period of 90 days during the active season for such pursuits." The lessee died· February 25, 1926. The notice of cancellation is dated March 11, 1926. The term "active season for such pursuits" must have reference to the milder months of the year when such operations are usually carried on. Hardsocg testifies that:

3. LANDLORD AND TENANT: leases: forfeiture: non-contract grounds.

"After Grooms signed the contract, he did not go ahead on the land and do any work except some stripping * * * The customers would drive in, and themselves load the wagon. Grooms had no machinery * * * he had no finances, and did not prosecute the work vigorously. I was on the land, from time to time, and saw how things were going on. * * * My complaint was that he didn't get the machinery in there."

The evidence, including that previously noted, shows that Hardsocg was fully acquainted with Grooms' financial condition; he knew what could be expected, and knew what ·Grooms

was doing. He evidently did not expect Grooms to do more than he was doing, and after Grooms' death, treated the contract as being in full force. It is argued that but $219.59 was paid on the minimum royalty of $300. $219.59 is the amount paid, according to the examination of his books made by decedent's children. Claimant testifies that Grooms "paid me just $300 at different times. * * * He paid me $300 royalty for the sand taken from the land." If the minimum had not been paid, the remedy provided was a lien on the crops. Hardsocg's conduct was utterly inconsistent with the existence of any ground of complaint of the sufficiency of the performance by Grooms. There was no refusal to perform the contract. No breach justifying cancellation appears. 13 Corpus Juris 657. —*Reversed.*

FAVILLE, ALBERT, KINDIG, and WAGNER, JJ., concur.

EVANS, C. J., dissents.