**In re the ESTATE OF Donald OHRT, Deceased.**

**Linda UTHOFF, Sandra Evans and Carl N. Evans, Appellants,**

v.

**Randall OHRT, As Executor of the Estate of Donald Ohrt, and Randall Ohrt, Individually, Appellees.**

No. 93–509.

Supreme Court of Iowa.

May 25, 1994.

Morris L. Eckhart of Milroy and Eckhart, Vinton, for appellants.

Ross Hauser of Shea Law Offices, Cedar Rapids, for appellee Randall Ohrt, individually.

Considered by HARRIS, P.J., and LAVORATO, NEUMAN, ANDREASEN, and TERNUS, JJ.

HARRIS, Justice.

Randall Ohrt, Linda Uthoff and Sandra Evans are the son and daughters of Donald and Margaret Ohrt. Margaret, who died in 1986, and Donald, who died in 1990, each had wills that granted Randall an option to buy farm real estate. Although there are other issues, the prime ones stem from these options. The facts can be more appropriately detailed in discussions of the issues that follow. The case was tried in equity so our review is de novo. Iowa R.App.P. 4.

I. Margaret's will (previously probated) granted farm real estate to the three siblings in "equal shares ... subject, however, to the following option ... I hereby grant unto my son ... the option to purchase from my daughters ... the ... real estate upon the following terms and conditions." The terms then allowed Randall to enter into a land contract with the sisters. The selling price was to be sixty-five percent of the appraised value.

In prior litigation the parties disputed the meaning of the option, the sisters contending Randall could purchase the land only by paying the sisters sixty-five percent of the value of the land. Randall contended the option required only a payment of sixty-five percent of his sisters' share of the appraised value.

The sisters asserted their view by challenging Margaret's will (on grounds of undue influence), after which the three reached a family settlement: each sister was to be paid $56,000 in cash. Evidence is in conflict whether the $112,000 total reflected the sisters' or Randall's interpretation. It would be necessary for us to resolve the conflict if, but only if, the family settlement controls the dispute in Donald's estate. His will contains a similar option that is now in dispute.

The option in Donald's will gave Randall six crop years during which he could lease the land but allowed him to buy it from the estate (rather than from the sisters), paying twenty percent down with the balance to be paid in ten annual installments at three percent below the prevailing interest rate. The selling price of the land was specified as "sixty-five percent (65%) of the appraised value of said real estate as determined by the Iowa inheritance tax appraisers for Benton County."

Donald's reason for so strongly favoring Randall in his estate was derived from their long close association in their farming operations which were interwoven. We adopt as our own the trial court's description of those operations:

Donald Ohrt began farming in the 1940s. He accumulated an estate valued at ap-

proximately $1.5 million at the time of his death.

The evidence shows that beginning in January 1968, and continuing until the time of his death, Donald Ohrt was engaged in a family farming operation with his son, Randall Ohrt. Donald and his wife, Margaret, owned or rented part of the farmland, Randall owned or rented part of the farmland, and some of the farmland was owned jointly by the Ohrts. Donald owned part of the machinery used to farm the ground, Randall owned part of the machinery, and part of the machinery was jointly owned. The taxes, rental payments and input cost for each crop were borne by the respective owner/renter of the ground, and the crops were divided according to ownership of the ground. Donald and Randall both provided labor to plant, cultivate and harvest the crops, irrespective of the type of crop or whose ground was utilized. At various times, both Donald and Randall also raised livestock and performed chores relating to the care of the livestock.

When Randall Ohrt began farming with his father, he started with limited assets. Through his work with his father, he was able to buy and rent additional acres of farmland and machinery, which added to the Ohrt farming operation. Through their hard work, perseverance and foresight, the Ohrts were able to survive the farm crisis of the '70s and '80s. They worked side-by-side until Donald became physically ill in the spring of 1988 and was unable to physically participate in the Ohrt farming operation. Randall Ohrt has continued to farm all of the Ohrt land until the present time. He has consulted Donald and kept him appraised of the status of the operation on almost a daily basis until Donald's death.

■ The first issue is whether, as the sisters contend, the family settlement reached in the mother's estate controls the terms of Randall's option in the father's estate. That agreement does not mention a formula or plan for exercising Randall's option. It merely states that the sisters will sell their interest in the farm for the amounts we already mentioned. The sisters nevertheless insist that a formula (Randall to pay one-third of the total appraised farm value to each sister) was used in reaching the $56,000 figures and also insist that the parties intended to be bound by it, not only in Margaret's, but also in Donald's estate.

The sisters cite two items in the agreement as evidence that the parties had Donald's, as well as Margaret's, estate in mind. In the first the parties agree that Donald's 1986 will was "substantially similar to his 1988 will." The second reference precludes either of the sisters from contesting Donald's 1988 will when it came to be probated.

The first of the two items presents the sisters with something of an anomaly because the language in the 1988 will was in fact changed to more closely conform with Randall's interpretation of what he is required to pay on exercising the option (to purchase the farmland from the estate by paying the estate two-thirds of its total appraised value). The sisters are thus driven to rely on damaging language in their attempt to show the family settlement extends to Donald's estate. It is readily apparent that the cited language is consistent with Randall's interpretation and inconsistent with the sisters' interpretation.

The real point is that neither of these references in the family settlement suggest that a formula is set for pricing the exercise of Randall's option in Donald's estate.

■ The law of course strongly favors family settlements. *Harris v. Randolph,* 213 Iowa 772, 783, 236 N.W. 51, 57 (1931). But the rule is clear that the scope of the settlements is not stretched to extend to matters not within the estate or those not expressly covered in the agreement. *See* 31 Am.Jur.2d *Executors and Administrators* § 88, at 82 (1989); M.L. Cross, Annotation, *Testator's Estate—Family Settlement,* 29 A.L.R.3d 8, 99–101 (1970).

■ In reaching the family settlement the parties were not oblivious to potential future problems in Donald's estate. But, if they wanted to be bound by a scheme for fixing the cost of Randall's options in that estate, they would have had to say so in the

agreement. This they totally failed to do. The trial court was correct in rejecting the contention that the family settlement in Margaret's estate controlled the option to Randall in Donald's estate.[1]

II. Article I of Donald's will provides:

I direct that the expenses of my last illness and funeral be paid out of my estate, and that all debts and claims filed against my estate and all federal estate tax and state inheritance taxes shall be paid from the personal property of my estate before any distribution of said property be made as hereinafter provided, and that the payment of said expenses and taxes shall not be charged against the respective beneficiaries and my executors shall not seek reimbursement from any beneficiary for the payment of said items.

Article II then specifically bequeaths all farm machinery, equipment and tools to Randall along with one car. Based on these two provisions, the sisters argue the specific bequests to Randall must be sold to satisfy debts of the estate. The district court believed ample funds existed in the estate to pay all debts, claims and taxes so that it was unnecessary to abate any specific bequests.[2]

Randall, acting as executor, distributed the machinery, tools, etc., and car to himself. He uses the farm equipment to farm the option property, which he currently rents from the estate. He has been depreciating the property since June of 1990. He sold the car to his son on contract.

We think Randall's distribution of this personal property to himself violated the terms of the will. *Nolte v. Nolte,* 247 Iowa 868, 877–78, 76 N.W.2d 881, 887 (1956) (special bequest made subject to payment of debts must be used to satisfy them). Insofar as it approved this distribution, the trial court decree must be reversed. Upon remand the trial court will order Randall to either: (1) reimburse the estate for the appraised value of any personal property distributed to him as may be necessary to satisfy estate debts; or (2) reclaim distributed assets (the distribution of which has been challenged on this basis) for the estate and arrange for their sale to satisfy estate debts.

III. In 1967 the Ohrts entered into an agreement with the plaintiff Sandra and her husband conveying to them a five-acre parcel of land. The agreement granted mutual rights of "first refusal."[3] Sandra and her husband gave the Ohrts a right of first refus-

1. At trial the sisters called an expert witness, attorney Orville W. Bloethe, to testify concerning legal matters that go to and control the ultimate issues in the case. His testimony, interpreting the wills and family settlement, was received without objection. Bloethe holds impeccable professional credentials and is widely recognized as an expert in the fields of probate and tax law.

   Even so his testimony should not have been received. Experts, no matter how well qualified, generally should not be permitted to give opinions on questions of domestic law. *United Cent. Bank of Des Moines v. Kruse,* 439 N.W.2d 849, 852 (Iowa 1989); *Briney v. Tri–State Mut. Grain Dealers Fire Ins. Co.,* 254 Iowa 673, 687, 117 N.W.2d 889, 896–97 (1963); 31A Am.Jur.2d *Expert in Opinion Evidence* § 136, at 143–45 (1989).

   This testimony is not subject to the rule of availability of evidence admitted without objection. *See* Edward W. Cleary, *McCormick on Evidence* § 54, at 140 (3d ed. 1984). This rule, authorizing use of objectionable evidence admitted without objection, relates to required proof and cannot work to change controlling principles of law.

2. According to the estate's federal tax return, no federal taxes were owing and debts totaled $584,-460. This amount included $6199 in funeral expenses, $68,075 in Donald's personal debts and $511,186 in mortgages and liens on real property of the estate. Personal property, excluding the specific bequests to Randall, totaled approximately $144,992 at the time of death. This amount also excludes Randall's rental and contract payments, under his option, to the estate. The approximate value of the specific bequest to Randall at issue was $96,725.

3. The agreements contained the following:

   In the event that the parties of the first part [Donald and Margaret], who are the owners of the property heretofore described in this paragraph, less the property heretofore deeded by them to second parties [Sandra and her husband] desire to sell the property heretofore described in this paragraph, they shall first notify ... [Sandra and her husband], who have the right to purchase said property at a price equal to that which ... [Donald and Margaret] could receive for the property from a bona fide purchaser. [Sandra and her husband] ... will have thirty (30) days to accept or reject this option to purchase, and if after thirty (30) days they decide not to purchase said property, ... [Donald and Margaret] then may sell the same to whomever they please.

al with respect to the five-acre parcel. The Ohrts in turn granted an identical right in some eighty acres of property adjoining the five-acre tract. At no time prior to Donald's death did any party attempt to sell any of this land.

Donald's will devised all his real estate, in equal shares, to his three children. As we have explained, this devise was subject to Randall's option to buy which he exercised in 1990. It included the same property on which Sandra and her husband held the right of first refusal. Sandra and her husband soon thereafter exercised their right of first refusal.

These conflicting rights were disputed at trial and the trial court held that Randall's option took precedence over the right of first refusal. In the trial court's view the first refusal was ineffective for several reasons. It was thought to be vague for lack of notice provisions, amount, terms, and provisions for tender. The trial court also thought it violated the rule against perpetuities. Even if enforceable, the trial court thought, it was never triggered because there was no "desire to sell" on Donald's part, rather it was a plain wish that Randall inherit the property. Finally the trial court noted a lack of showing of the amount specified in the agreement that Donald could receive from a bona fide purchaser.

■■ Although we agree with the trial court that the right given in 1967 to Sandra and her husband could have been specified in more detail, we do not agree that it is so hopelessly vague as to be unenforceable. Although courts cannot make a contract when there is none, they are reluctant to hold a contract unenforceable for uncertainty. *Palmer v. Albert*, 310 N.W.2d 169, 172 (Iowa 1981). Courts spend every effort to avoid such a result and, in doing so, consider surrounding circumstances and conduct of the parties. *Id.*

The agreement Sandra and her husband had with her parents is capable of being enforced. Those unspecified matters mentioned by the trial court can be supplied from the surroundings and the conduct of the parties.

■ Neither do we see the rule against perpetuities as an insurmountable problem. It must be remembered that Iowa has adopted the "wait-and-see" law. Under Iowa Code section 558.68 (1993) the rule against perpetuities "shall be measured by actual events rather than possible events." Under this provision the lives of the beneficiaries can be measuring lives. Iowa Code § 558.-68(3). Because the right was exercised during lives of the named beneficiaries the rule against perpetuities was not violated. The rule therefore poses no problem in allowing the right of first refusal to survive Donald.

■ A more difficult question is whether the so-called right of first refusal survived the death of Donald and Margaret. We think it did. The rule is that such an interest will survive the death of either party unless a contrary intent is expressed in the agreement. *Petersen v. Olson*, 253 Iowa 469, 485, 112 N.W.2d 874, 883 (1962); *In re Estate of Grooms*, 204 Iowa 746, 750, 216 N.W. 78, 80 (1927). No contrary intent was expressed so the right could be enforced during the period of administration of Donald's estate.

■ A final impediment to Sandra and her husband is whether the granting to Randall of his option to buy and his exercise of it amounted to a "desire to sell" so as to trigger the right of first refusal. Randall argues his option is a simple inheritance; Sandra argues it is a sale; it is apparent that it has characteristics of both and lacks the total characteristics of either.

From Sandra's point of view Randall is a purchaser; the exercise of his option exposes her to the same risks (regarding enjoinment of her property) that would exist had her parents wished to transfer to a total stranger. From Randall's view, the option is an inherited advantage with regard to acquisition of the property. Although the question obviously can be argued either way, we think Randall's option, even though he inherited it, retains the essential nature of a sale. Under Randall's option the property would be transferred from the father's estate, for a price paid to the estate.

The amount to be paid was necessarily unspecified because of fluctuations in market

**902**

value over what was likely to be, and proved to be, an extended period. The parties contemplated it would be the amount offered by a willing purchaser in an arm's length transaction. In view of the present circumstances, contrary to Sandra's contention, the cost to Sandra and her husband should be the full amount fixed for the property by the inheritance tax appraisers.

We think Randall's option triggers the 1967 "first refusal" right accorded to Sandra and her husband. Upon remand the trial court will enter an order accordingly.

■ IV. The final assignment challenges the trial court order allowing fees to Pickens, Barnes & Abernathy, a Cedar Rapids law firm, for representing Randall in his capacity as executor of Donald's estate.

Randall hired the firm pursuant to Iowa Code section 633.315, which authorizes an executor to hire counsel at estate expense. It is the responsibility of the attorney so designated, among other things, to defend or prosecute any proceeding "in good faith and with just cause," on behalf of the estate. *Id.*

Those who challenge the probate of an estate in which they are interested are routinely called upon to indirectly contribute to the attorney fees for their opposition. Understandably they consider this unfair and frequently, as here, vigorously challenge it.

These challenges routinely focus on the complaint that the proceeding involves a challenge to an estate position that coincides with the personal interests of the executor. The challenged personal advantage, of course, arises from the wording of the will so that the intent of the testator is implicated.

In sorting through the appropriateness of attorney fees allowed under the statute we have long accorded considerable discretion to the trial court. *In re Estate of Law,* 253 Iowa 599, 605, 113 N.W.2d 233, 236 (1962).

The legal services here of course inured to Randall's advantage, but this challenged advantage was intended by the testator. On this record we find no abuse in the allowance.

Other contentions have been considered and are found to be without merit. Tax costs equally to the appellants and to the appellees. The trial court decision is accordingly

**AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.**